John Patrick AHEARN, Appellant,

v.

The STATE of Texas, Appellee.

Mary Elizabeth AHEARN, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 57479, 57480.

Court of Criminal Appeals of Texas, Panel No. 2.

June 20, 1979.

Rehearing En Banc Denied Oct. 31, 1979.

---

Frank Maloney, Kenneth E. Houp, Jr. and David H. Reynolds, Austin, for appellants.

Ronald Earle, Dist. Atty. and Charles E. Hardy, Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

Before DOUGLAS, TOM G. DAVIS and DALLY, JJ.

## OPINION

DOUGLAS, Judge.

The convictions of John Patrick Ahearn and Mary Elizabeth Ahearn are for injury to a child under V.T.C.A., Penal Code, Section 22.04. The jury assessed punishment for each at eighteen years.

The sufficiency of the evidence is challenged and many grounds of error are urged.

The second count of the bill of indictment alleges:

". . . that John Patrick Ahearn and Mary Elizabeth Ahearn on or about the 23rd day of October A.D., 1976, and before the presentment of this indictment, in said county and state, did then and there recklessly and with criminal negligence engage in conduct that caused serious physical deficiency to Johnny Lee Ahearn, a child younger than 15 years of age, by then and there omitting to provide support for Johnny Lee Ahearn, who was then and there the child of the defendants by providing less than the support needed by the said Johnny Lee Ahearn for food and medical care when the defendants could have provided such support and were legally obligated to provide such support, . . ."

On October 23, 1976, at approximately 6:09 p. m., three Austin Emergency Medical Services technicians, James Loflin, James McMichael and Robert McMinn, arrived at Ahearns' trailer house. They were responding to a call which stated that a child was choking at that location. Upon arriving they found Mary Ahearn outside crying and John Ahearn inside the trailer apparently giving mouth-to-mouth resuscitation to the deceased, Johnny Lee Ahearn, a four and a half month old baby. McMinn testified that the child was emaciated and blue, had no pulse or pupil reaction, and was not breathing; Loflin stated that Johnny's bones were clearly visible, and McMichael related that he found dried feces on the baby's buttocks.

The child was rushed to Brackenridge Hospital. During the ride he was given mouth-to-mouth resuscitation, oxygen via a pediatric Ambu bag mask, and cardiopulmonary resuscitation (CPR).

Doctor Milton Williams testified that he was on duty in the emergency room at

Brackenridge Hospital when the ambulance with the baby arrived. He stated that the child was not breathing, had no pulse and appeared blue from a lack of oxygen. After trying unsuccessfully to revive him, Johnny Lee Ahearn was pronounced dead at 6:24 p. m.

Dr. Williams testified that the deceased was obviously malnourished and in a state of severe dehydration. A rash was evident on the baby's cheeks and forehead. Two infections were found on Johnny's genitals. Dr. Williams stated that infections of the type found on the prepuce of the baby's penis are usually caused by lack of cleanliness. Johnny also had an infected scrotum which had two one-inch long yellow worms inside this wound. Testifying from photographs of the baby made shortly after his death, Dr. Williams stated that he was "very, very small, the ribs are very prominent, he has what is called a scaphoid abdomen, the abdomen is very, very lax, withdrawn." He noted that Johnny's skin texture was lax and seemed to be wrinkled. Slight livor mortis and rigor mortis was also observed.

Dr. Williams testified that a normal child of Johnny's age should have weighed in the vicinity of fourteen to sixteen pounds. The deceased weighed seven pounds eight ounces at birth and six pounds eleven ounces at the time of his death. In other words, the child weighed thirteen ounces less at the age of four and a half months than he did at birth.

Based on his observations of the deceased at the time of death, Dr. Williams concluded that the baby was in a state of serious physical deficiency, had not received enough of the minimum requirements of food and had been in need of medical attention for some period of time. Post-mortem X-rays also revealed that the child had a broken collarbone. Dr. Williams and Dr. James E. Ritting, a radiologist, estimated the fracture was less than two weeks old, and Dr. Williams related that Johnny should have received medical attention. He was of the opinion that even if the dehydrated and malnourished condition could have been largely attributed to a metabolic disfunction, the baby should have been brought to medical attention for treatment between two and four weeks of age.

Dr. Coleman de Chenar performed an autopsy on the deceased and found discolorations about the baby's face which indicated some impact by mechanical force. He determined that the penis wound could have been caused by accumulated urine and excrement while the scrotum wound appeared to have developed from stagnant urine fluid. The child was undernourished, dehydrated and from under the skin fair tissue had completely disappeared from areas like the chest and abdominal walls, giving the impression that the skin was oversized for the body. The lungs revealed that the child had inhaled small black granules while may have been caused by exposure to dust, smoke or soot for a considerable length of time. Fluid which contained some particles identical with the gastric contents and having a bile discoloration was discovered in both the lungs and the trachea. In the abdominal cavity there was extensive internal bleeding caused by a blow with a blunt object. Dr. de Chenar said it was not the type of injury found when someone falls against the corner of furniture. Besides the bleeding, the blow caused the stomach to regurgitate its contents as well as a bile colored fluid from the small intestines. This fluid was inhaled by the baby which resulted in suffocation. The blow was estimated to have occurred within hours of the baby's death. This type of injury, he said, would be consistent with being struck by a human fist but would not be the result of cardiopulmonary resuscitation.

On cross-examination Dr. de Chenar testified that the hemorrhaging in the mesh of connective tissues was indicative of an antemortem injury. He stated that the bruises on the baby's face and lips were not consistent with the application of a cardiopulmonary resuscitation device nor mouth-to-

mouth resuscitation but could have been caused by forceful hand pressure. As to the genitalia, Dr. de Chenar said that the prepuce of the penis, although functional, did exhibit tissue defect and death and was the oldest injury on the child. Although the penis wound was large enough to allow the biting part of two one-inch worms, the scrotum injury was not sufficiently large enough to do so. The collarbone fracture was not evident to Dr. de Chenar during the autopsy. Finally, he testified that the cause of death was due to suffocation, not the injuries to the head, left temporal region, genitalia and knees.

Dr. Joseph Jachimczyk, chief medical examiner for Harris County, was called by the defense. He testified that the head wound as well as contusions on the left temporal region and left chin would be consistent with marks caused during the administration of cardiopulmonary resuscitation; and the lip marks were consistent with those left by mouth-to-mouth resuscitation. His examination of test slides prepared by Dr. de Chenar revealed no extensive bleeding in the stomach wall or intestinal loops. The only hemorrhaging he found occurred in the fat attached to the outer layer of the stomach. He felt that this was minor and would have healed on its own. Dr. Jachimczyk did not believe the bleeding was caused by a frontal blow but instead was more consistent with application of cardiopulmonary resuscitation. The penis wound was estimated by him to be five days old and the scrotal injury, which he saw only in photographs, was believed to be merely a rash. Although many children suffer from intestinal worms, he said, he could not tell if the deceased was so afflicted. A collarbone, he related, could be broken by poor handling of the child. While admitting that the deceased was dehydrated and malnourished, and acknowledging that a normal four and a half month old baby should weigh twice its birth weight or around fifteen pounds, Dr. Jachimczyk testified that none of his examinations suggested a "battered child." This was because dehydration can be caused by a number of factors including fever, lack of nourishment, intestinal worms, diarrhea and malabsorption syndrome which is generally the result of a pancreas disfunction. No pancreas slides were made during the autopsy. Despite the deceased's malnourished and weakened condition, the witness stated that a normal child would not have had a better chance of survival because death was due to suffocation, not malnourishment. He did not have an opinion as to whether the baby had a serious physical deficiency nor could he determine the cause of the child's malnourishment.

On cross-examination, Dr. Jachimczyk admitted that his testimony was based solely on the autopsy protocol, death certificate, birth records, emergency room records, photographs, diagrams, slide examinations and a conversation with Dr. de Chenar. He did not perform the autopsy and stated that the pathologist who actually performed the autopsy was more capable than he of drawing conclusions as to the location and extent of injuries. Similarly, he acknowledged that the examining physician at death would have a more accurate opinion of the time of death than a pathologist who performed an autopsy twenty-four hours later and after embalming. He was of the opinion that the earliest signs of livor mortis occur about two hours after death with rigor mortis setting in later. The witness conceded that, if the child died of suffocation and had been dead for at least one hour, this would be consistent with the testimony of the EMS personnel that the child had no pulse or pupil reaction and was not breathing. If that were the case, he said the administration of cardiopulmonary resuscitation and mouth-to-mouth resuscitation would not have caused the facial marks, head injury or hemorrhaging.

Joe Cox, owner of the trailer occupied by the Ahearns and the deceased at the time of death stated that the interior of the trailer was in poor condition. He had found human waste on the couch and dirty diapers throughout. Dirty diapers were also found

in the front yard of the trailer. The couch had to be burned by Cox after appellants had moved out because it was stained by the waste and had a putrid odor. On several occasions between June and September of 1976, Cox saw the baby and noted that he did not grow. He looked very sick and thin with his bones clearly visible. There were flies around and upon him. Cox also observed Mary change Johnny's diapers without removing the waste and saw her feed the baby from dirty bottles. Cox reported appellants to the local welfare authorities.

Mary Beth Calhoun, a neighbor of appellants, related that Mary and the deceased came to her trailer on one occasion with an eight-ounce bottle of water. Mary stated that she brought water because the baby did not like milk. Calhoun then gave the deceased some milk and "he drank it so fast that he choked on it." She further stated that Mary would leave the deceased and his one-year-old brother, Tommy, alone at home for several hours while visiting with the owners of a nearby gas station. These visits occurred "mostly every day."

Willouise Glass, owner of the station, testified that Mary would frequent the station for long periods of time "almost every day", leaving her children alone at home unattended. Sometime in late September or early October, Glass saw Mary feed the baby with an eight-ounce bottle. His chest bones were visible and Glass felt that he was taking the milk too fast. Mary replied, "Oh, well, maybe Tommy bit the end of the nipple off", and continued to feed him. The child drank "just like an animal grasping all the food he could get at once", and almost immediately vomited. On another day, Mary told Glass that the welfare department was planning to inspect the trailer and that she was nervous and had cleaned the trailer. Glass also saw Mary holding the baby with one of his legs twisted back under him. When this was brought to her attention, she merely replied, "That's okay."

On the day of Johnny's death, Mary came to the gas station and asked to use the phone because "I think my baby is dead." Glass immediately called EMS and then, along with her husband, accompanied Mary back to the trailer. There Glass found John kneeling beside the baby periodically giving mouth-to-mouth resuscitation. As Glass entered the trailer John looked in her direction and said, "That's it." He then continued his efforts. Mrs. Glass stated, however, that John did not appear to be emotionally upset but merely annoyed. As appellants prepared to follow the ambulance to the hospital, they were planning to leave their one and a half year old son, Tommy, alone and unattended because Mary's mother was coming "in a little while." Finally, a neighbor objected and Tommy was left with her.

Joann Ray testified that she sold a car to Mary's mother, Mrs. Alvin Edwards, who in turn gave it to appellants. She related that on October 17, 1976, she and her husband went to appellants' trailer to discuss delinquent car payments. Although no one answered the door, they did see a one and a half year old boy at a broken window. The fact that the boy was home alone, coupled with the size of the hole in the window and the position of the boy's head relative to the hole, made Mrs. Ray extremely upset. Mary was eventually located at the gas station. Mrs. Ray also testified that when the car was sold originally it was in very good condition but when it was finally repossessed it had to be sold for junk because it was filthy, had beer cans all over it, food caked in it, and smelled so bad that she could not get near it.

Paul Bazemore testified that he was formerly married to Mary and had visitation privileges with regards to their son, Tommy, who lived with appellants. He related that when he visited the trailer it was very dirty and odoriferous. John was drinking on these occasions and "sometimes he was real drunk." Bazemore saw Johnny only once during his short lifetime and found

him to be discolored and unresponsive. The baby was wearing a full length gown, however, which prevented further inspection. Because of these conditions, Bazemore contacted the State Department of Public Welfare.

After receiving several reports on appellants, Charles Greathouse, a welfare caseworker, attempted to find the Ahearns at their trailer. He made two unannounced visits, saw garbage around the front of the trailer but was unable to locate them. Mary called Greathouse in response to a message he left and an appointment was arranged. At the meeting on September 30, 1976, he noted that the deceased "was very, very small. * * * He appeared to me to be very underweight, his hair was— seemed to be very dull; his stomach slightly distended; there was what appeared to be a heat rash on his stomach, and most striking of all were his legs which were very, very thin." Mary told Greathouse that she had taken Johnny for an examination at Bergstrom Air Force Base, where John was stationed, when he was six weeks old but had not returned. She did not notice any perceptible problem because her husband had been very small as a baby. She agreed to take the deceased to Bergstrom for another examination and Greathouse volunteered to provide transportation if she had problems.

At an October 6th visit, Mary told Greathouse that she had taken Johnny to the Rosewood Clinic for immunizations and had made arrangements to take the baby to a doctor at Bergstrom on October 20, 1976. On the day of the baby's death, October 23, Greathouse saw the Ahearns at the hospital where Mary stated that they had not been able to keep the October 20 appointment at Bergstrom.

The State adduced other evidence which showed that the Ahearns and their children were eligible for free medical care at Bergstrom Air Force Hospital. They did not apply for these privileges, however, until a month after the death of Johnny. The State introduced evidence that Johnny Lee Ahearn had never been treated at either Bergstrom or the Rosewood Medical Clinic.

Mrs. Alvin Edwards, mother of Mary, testified for the defense that she bathed and diapered Johnny in late September but found diaper rash to be his only ailment. On the weekend of October 16 and 17, 1976, she again cared for him and noted that the diaper rash had improved. On this occasion she commented that he was on "junior foods" and fed him macaroni and cheese along with one and a half ounces of formula which he took "real well." Mrs. Edwards did admit to seeing Mary change the deceased's diapers without wiping off the waste, and she conceded that she had urged Mary to seek medical help for Johnny. At the hospital on the day of the baby's death, Mary told her mother that she did not take the baby to Bergstrom on October 20 because John could not get off work to take her. To this Mrs. Edwards replied, "Well, I would have made arrangements somehow to have gotten off it he couldn't get off." Previously, Charles Greathouse had also volunteered to drive her to the doctor.

Finally, pictures taken shortly after death and introduced into evidence depict an extremely emaciated male baby. His ribs were clearly visible and his face shows evidence of bruises. Dried feces were evident on his buttocks and the prepuce of his penis was purple. His skin was extremely lax and wrinkled. Small wounds could be seen on his head and back. His condition was reflected by photographs, two of which are included on following pages.

Exhibits to follow.

STATE'S EXHIBIT NO. 3

STATE'S EXHIBIT NO. 5

Appellants contend that the evidence is insufficient to show that the deceased was suffering from a serious physical deficiency. They also argue that since none of the external injuries contributed to death, there was no serious physical deficiency.

The evidence as set out above showed that the deceased was malnourished, severely dehydrated and weighed thirteen ounces less at the age of four and a half months than he did at birth. The prepuce of his penis was infected and had a two millimeter

deep defect in it as well as some evidence of tissue death. His scrotum was infected and two one-inch yellow worms were found there. The skin was very lax, and his lungs contained small black granules similar to dust or soot. The baby's face was covered with sores; the color of which indicated some impact by mechanical force. He also suffered from a broken collarbone. There was extensive hemorrhaging in his abdomen. This bleeding was caused by a blow by a blunt object and was of sufficient force to cause regurgitation of the gastric contents of both the stomach and the small intestines. The inhalation of the vomit resulted in death. Dr. Williams, the examining physician, testified that in his opinion the baby was in a state of serious physical deficiency when he was examined. Doctors de Chenar and Jachimczyk also stated that he was in need of medical attention.

It is well settled that we are bound to view the evidence in a light most favorable to the verdict. *Esquivel v. State,* 506 S.W.2d 613 (Tex.Cr.App.1974).

"Serious physical deficiency" is not defined in the Penal Code. Although "serious bodily injury" is defined in V.T.C.A., Penal Code, Section 1.07(a)(34), we have held that it is distinguishable from serious physical deficiency. *Morter v. State,* 551 S.W.2d 715 (Tex.Cr.App.1977).

A deficiency does not have to cause or contribute to death before a jury is warranted in finding it "serious." We conclude that the deceased's severely emaciated condition together with the nature, extent and variety of his injuries shows the type of serious physical deficiency as denounced in the statute. See *Vaughn v. State,* 530 S.W.2d 558 (Tex.Cr.App.1975). Therefore, we hold the evidence is sufficient to support the jury's finding that there was a serious physical deficiency.

Next, appellants contend that the evidence is insufficient to show that they caused the serious physical deficiency.

V.T.C.A., Penal Code, Section 22.04(a), provided at the time of trial:

"(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct that causes serious bodily injury, serious physical or mental deficiency or impairment, or deformity to a child who is 14 years of age or younger."

Appellants were indicted for recklessly and with criminal negligence engaging in conduct that caused serious physical deficiency to the deceased by providing less than the minimum requirements for food and medical care which they were legally obligated to provide.

The thrust of their argument is that the evidence did not establish that lack of food or medical care caused the deceased's serious physical deficiency.

V.T.C.A., Family Code, Section 12.04(3), provides that parents have: [1]

"(3) the duty to support the child, including providing the child with clothing, food, shelter, medical care, and education."

Under this statute each parent has a duty to support his or her minor child. *Harrington v. State,* 547 S.W.2d 616 (Tex.Cr.App. 1977); *Ronk v. State,* 544 S.W.2d 123 (Tex. Cr.App.1976); V.T.C.A., Family Code, Section 4.02.

In *Harrington v. State,* supra, the Court held that:

"The omission or neglect to perform a duty resulting in death, such as a mother's failing to feed her child, may constitute murder where the omission was willful and there was a deliberate intent to cause death."

Where the parents' omission or neglect to perform a duty results in a serious physical deficiency, such as failing to provide adequate food or medical care to an obviously emaciated child, they must be guilty of injury to a child where the omission was intentional, knowing, reckless or with criminal negligence.

---

1. "Parent" is defined as "the mother, a man as to whom the child is legitimate, or an adoptive mother or father." V.T.C.A., Family Code, Section 11.01(3).

V.T.C.A., Penal Code, Section 6.03, provides in relevant part:

"(c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

"(d) A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."

▆▆▆ There is no evidence showing that appellants sought medical care for their child at any time during his short life, despite the fact that it was available to them at no cost. There was, however, an enormous amount of testimony relating to the infant's physical deterioration over those four and a half months as well as the squalid surroundings in which he lived. Each physician testified that the deceased was in need of medical attention, and numerous lay witnesses related being sickened by the sight of him. He and his one year old brother lived in filthy conditions and were left unattended for extended periods of time.

The cause of the genital wounds was determined to be a lack of cleanliness which could only be attributed to appellants' failure to properly care for the children. When it became obvious that the child was losing weight and was in such a physical condition and when the wounds became evident, appellants had a duty to seek medical care. The result of their failure to do so no doubt caused a continuing decline in the baby's condition such that the jury was able to find that appellants acted at least reckless or with criminal negligence. *Harrington v. State*, supra, is distinguishable as to the proposition that it is necessary to exclude all other causes for the deceased's malnourishment. *Harrington* involved an intentional murder by starvation by the parents of a two-year-old child. In order to convict, all other possibilities had to be excluded. Here, it was only necessary to show that appellants' reckless or criminally negligent actions in failing to provide adequate food or medical care were the cause of the deceased's condition, not their specific intent nor the specific physical causes of the ailments.

Appellants contend the trial court erred in failing to define "serious physical deficiency" in its charge, and that the term is unconstitutionally vague.

In *King v. State*, 553 S.W.2d 105, cert. denied, 434 U.S. 1088, 95 S.Ct. 1284, 55 L.Ed.2d 793 (1978), we cited *Joubert v. State*, 134 Tex.Cr.R. 219, 124 S.W.2d 368 (1938), for the proposition that:

"Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms, and under such circumstances such common words are not necessarily to be defined in the charge to the jury."

V.T.C.A., Penal Code, Section 1.05(a), provides that:

"(a) The rule that a penal statute is to be strictly construed does not apply to this code. The provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code."

In *King v. State*, supra, we held that "deliberately", "probability", "criminal acts of violence", and "continuing threat to soci-

ety" did not have to be specially defined for the jury. In addition, "burglarious entry", *Thomas v. State*, 543 S.W.2d 645 (Tex.Cr. App.1976); "sound memory and discretion", *Hogan v. State*, 496 S.W.2d 594 (Tex.Cr. App.1973); "reasonable doubt", *Whitson v. State*, 495 S.W.2d 944 (Tex.Cr.App.1973); "pre-meditated design", *Mitchell v. State*, 365 S.W.2d 804 (Tex.Cr.App.1963); "voluntarily" as used in a murder with malice indictment, *Joubert v. State*, supra, all need not be defined. See also Article 3.01, V.A. C.C.P.

■ The question of serious physical deficiency is one of fact for the jury to determine based on all the evidence before it. The term is simple and need not be defined in the court's charge.

■ As to the issue of vagueness, it is well settled that a statute is not rendered unconstitutionally vague merely because the words or terms are not specifically defined. *Powell v. State*, 538 S.W.2d 617 (Tex.Cr.App.1976). The following terms have been held not vague or indefinite: "probability", *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976); "an act of violence or threatened [act of] violence to a person or property", *Powell v. State*, supra; "bodily injury", in V.T.C.A., Penal Code, Section 22.02(a)(2) as defined in V.T.C.A., Penal Code, Section 1.07(a)(7), *Ramirez v. State*, 518 S.W.2d 546 (Tex.Cr.App.1975); "signal to stop", *Stein v. State*, 515 S.W.2d 104 (Tex.Cr.App.1974); "moderate restraint or correction", *Nabors v. State*, 508 S.W.2d 650 (Tex.Cr.App.1974); "edible meat", *Sanford v. State*, 492 S.W.2d 581 (Tex.Cr.App.1973); "solicit", *Page v. State*, 492 S.W.2d 573 (Tex.Cr.App.1972).

■ A statute is unconstitutionally vague only if persons of common intelligence must necessarily guess at its meaning and differ as to its application. *Papachris-*

*tou v. City of.Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). We hold that the term "serious physical deficiency" is not unconstitutionally vague.

Appellants contend that the evidence is insufficient to show the criminal agency of each appellant. Specifically, they aver that the evidence is insufficient to show that any steps they could have taken would have alleviated the deceased's condition.

"Each parent has a duty to support his or her minor children." V.T.C.A., Family Code, Sections 4.02, 11.01 and 12.04; *Harrington v. State*, supra; *Ronk v. State*, supra. "Unless it is shown that one parent [had] sole and exclusive care, custody, and control, both may be guilty of an offense under Section 22.04, supra." *Harrington v. State*, supra.

■ In the instant case, the evidence as to appellants' actions was before the jury as was medical testimony on the severity and causes of the deceased's condition. We hold that the jury as charged on parental duties and criminal responsibility was warranted in finding that each of the appellants neglected parental duties to the baby and thereby contributed to his condition.

■ They complain that the court erred in denying their requested charge on the lesser included offense of criminal non-support.

V.T.C.A., Penal Code, Section 25.05(a), provides:

"(a) An individual commits an offense if he intentionally or knowingly fails to provide support that he can provide and that he was legally obligated to provide for his children younger than 18 years, or for his spouse who is in needy circumstances."

Lesser included offenses are governed by Article 37.09, V.A.C.C.P.[2]

2. Article 37.09, V.A.C.C.P., provides:
"An offense is a lesser included offense if:
"(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
"(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
"(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
"(4) it consists of an attempt to commit the offense charged or an otherwise included offense."

In *Bayona v. State*, 544 S.W.2d 155 (Tex. Cr.App.1976), this Court held that an assault under V.T.C.A., Penal Code, Section 22.01(a)(1), is not a lesser included offense of criminally negligent homicide under V.T. C.A., Penal Code, Section 19.07. The Court reasoned that since a higher degree of mental culpability intentionally, knowingly or recklessly was required for an assault, it could not be a lesser included offense under Section 3 of Article 37.09, supra. As to Section 2 of Article 37.09, supra, the lesser serious injury must be the only difference between the two offenses.

In comparing Sections 22.04(a) and 25.-05(a), it can be readily seen that appellants were indicted under Section 22.04(a) for "recklessness and criminal negligence." Section 25.05(a) requires a finding of "intentional or knowingly." Thus, this was not a lesser included offense under Sections 1 and 3 of Article 37.09. See *Bayona v. State*, supra, (concurring opinion). Section 2 provides that the only difference between the offenses is a less serious injury or risk thereof. Such is not the case here. Criminal non-support is not an attempt to injure a child under Section 4 of Article 37.09, supra. No error is shown.

Complaint is made that the court erred in failing to charge the jury on the law of circumstantial evidence. In *Ransonette v. State*, 550 S.W.2d 36 (Tex.Cr.App.1976) (Opinion on Appellant's Motion for Rehearing), this Court stated:

"A charge on circumstantial evidence is required only where the evidence of the main fact essential to guilt is purely and entirely circumstantial. See e. g. *Wilson v. State*, 154 Tex.Cr.R. 59, 225 S.W.2d 173 (1949). A charge on circumstantial evidence is necessary only when the State's case depends entirely upon circumstances for conviction. See e. g. *Nailing v. State*, 152 Tex.Cr.R. 161, 211 S.W.2d 757 (1948); *Wells v. State*, 134 Tex.Cr.R. 412, 115 S.W.2d 658 (1938). An instruction as to circumstantial evidence need not be given

where the State relies only in part on circumstantial evidence, *Lawler v. State*, 110 Tex.Cr.R. 460, 9 S.W.2d 259 (1927); *Coleman v. State*, 90 Tex.Cr.R. 297, 235 S.W. 898 (1921), even though the State relies on a chain of circumstances that may be considered the major part of the evidence on which the State relies for conviction. *Dodd v. State*, 149 Tex.Cr.R. 156, 192 S.W.2d 263 (1946). See 31 Tex. Jur.2d 682–683, Instructions, Sec. 123; *Morris v. State*, 402 S.W.2d 161 (Tex.Cr. App.1966); *Russell v. State*, 396 S.W.2d 117 (Tex.Cr.App.1965)."

■ The direct evidence adduced at the trial consisted of eyewitness accounts of the child's visible deteriorating health; the filthy environment appellants lived in; the failure to properly clean the baby when his diapers were changed; his malnourished and dehydrated appearance; evidence of improper feeding and holding methods; unsanitary baby bottles; repeated attempts to convince appellants that the deceased was in need of immediate medical attention; obvious sores and bruises; an unsupervised homelife; the availability of free medical care; lies as to the baby's clinic visits; and a general lack of concern on appellants' part for their children's welfare. This evidence of the baby's condition was direct. This, coupled with appellants' statutory duty to support and failure to provide care, was sufficient to show agency and causation. The court did not err in refusing to give the requested charge.

■ They complain of the court's refusal to give appellants' requested charge on criminally negligent homicide. Although originally indicted for murder, as well as injury to a child and involuntary manslaughter, the State elected to proceed only on the charge of injury to a child. As discussed above, criminal negligent homicide is not a lesser included offense under Article 37.09, supra.

**340**

No reversible error is shown. The judgments are affirmed.[3]

---

**3.** Other contentions appear in Part II of this opinion which is not for publication. It contains no new questions of law. See *Thompson v. State*, 514 S.W.2d 275, 278, footnote 2 (Tex. Cr.App.1975).

The other contentions discussed are that the court erred in:

1. Refusing to grant a severance;
2. Overruling motions to quash the indictment;
3. Failing to grant a new trial or reduce the punishment because the Legislature made the act a third degree felony after they were sentenced;
4. Not holding that the penalty provisions of the statute constituted cruel and unusual punishment;
5. Introducing X-ray photographs of a broken collarbone of the deceased;
6. Admitting evidence of John Ahearn's acts of intoxication;
7. The asking of questions by the prosecutor about who the older child of appellants was to stay with after appellants were in custody;
8. Permitting an emergency technician to testify that the bruises on the baby's face were not caused by attempts to revive him;
9. The asking of an unanswered question of Dr. Williams;
10. Admitting into evidence the emergency room records; and
11. Failing to give a requested charge that a voluntary act was required.