HCA, INC., HCA–Hospital Corporation of America, Hospital Corporation of America, and Columbia/HCA Healthcare Corporation, Appellants,

v.

Sidney Ainsley MILLER, By and Through Her Next Friend, Karla H. MILLER, and Karla H. Miller and J. Mark Miller, Individually, Appellees.

No. 14–98–00582–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 28, 2000.

Lauren L. Beck, Houston, Patricia D. Pope, Austin, Michael A. Hatchell, Tyler, Shannon H. Ratliff, Austin, for appellants.

Michael Sydow, Houston, David E. Keltner, Fort Worth, Murray Fogler, Houston, for appellees.

Panel consists of Chief Justice MURPHY and Justices MAURICE E. AMIDEI and EDELMAN.

## MAJORITY OPINION

EDELMAN, Justice.

HCA, Inc., HCA–Hospital Corporation of America, Hospital Corporation of America, and Columbia/HCA Healthcare Corporation (collectively, "HCA") appeal a judgment entered in favor of Sidney Ainsley Miller ("Sidney"),[1] by and through her next friend, Karla H. Miller, and Karla H. Miller ("Karla") and J. Mark Miller ("Mark"), individually (collectively, the "Millers"). Among other things, HCA contends that a health care provider is not liable in tort for administering urgently needed life-sustaining medical treatment to a newborn infant contrary to the pre-birth instructions of her parents not to do so. After a lengthy struggle with the difficult issues presented, we conclude that HCA is not liable under the facts of this case, reverse the judgment of the trial court, and render a take-nothing judgment.

### Background

Although the tragic circumstances of this case are far more numerous, those pertinent to this appeal can be summarized

---

1. Although the jury charge submitted liability and damage questions in favor of only Karla and Mark, individually, and not on behalf of Sidney, the trial court's judgment awards damages to the "plaintiffs," which includes Sidney. However, because HCA's issue based on lack of duty is not limited to the claims of Karla and Mark, individually, and because our sustaining of that issue negates HCA's liability to Sidney as well as to Karla and Mark, the discrepancy between the jury charge and judgment does not affect our disposition of the case.

as follows. Early on August 17, 1990, Karla was admitted to Woman's Hospital of Texas (the "hospital") with symptoms of premature labor. An ultrasound revealed that her fetus, weighing approximately 629 grams, had an estimated gestational age of 23 weeks. In addition, Karla was feared to have an infection that could endanger her life. Dr. Jacobs, Karla's attending obstetrician, and Dr. Kelley, a neonatologist, informed the Millers that if the baby were born alive and survived, she would suffer severe impairments.[2] Accordingly, the Millers orally requested that no heroic measures be performed on the baby after her birth.[3] Dr. Kelley recorded the Millers' oral request in the medical records, and Dr. Jacobs informed the nursing staff that no neonatologist would be needed at delivery.

However, after further consultation, Dr. Jacobs concluded that if the Millers' baby was born alive and weighed over 500 grams, the medical staff would be obligated by law and hospital policy to administer life-sustaining procedures even if the Millers did not consent to it. Dr. Jacobs explained this to Mark who verbally reiterated his and Karla's desire that their baby not be resuscitated.

Sidney was born late that night. The attending neonatologist, Dr. Otero, determined that Sidney was viable and instituted resuscitative measures. Although Sidney survived, she suffers, as had been anticipated, from severe physical and mental impairments and will never be able to care for herself.

The Millers filed this lawsuit against HCA,[4] asserting: (1) vicarious liability for the actions of the hospital in: (a) treating Sidney without consent; and (b) having a policy which mandated the resuscitation of newborn infants weighing over 500 grams even in the absence of parental consent; and (2) direct liability for failing to have policies to prevent such treatment without consent. Based on the jury's findings of liability[5] and damages, the trial court en-

2.  Mark testified that medical personnel at the hospital indicated to him that they had never had such a premature child live and that anything they did to sustain life on such an infant would be guesswork on their part. They further told him that every year for the past five years, the weights of children being born successfully had gotten lower, but they were still learning.

3.  Dr. Jacobs testified that abortion was not an option for Karla because of her infection. As contrasted from a birth, an abortion is a procedure that is generally fatal to an infant. *See* TEX. FAM.CODE ANN. §§ 161.006(b) (Vernon 1996) (defining abortion as being for the purpose of causing the death of the fetus), 33.001(1) (Vernon Supp.2000) (defining abortion as being reasonably likely to cause such death); TEX. HEALTH & SAFETY CODE ANN. §§ 170.001(1) (Vernon Supp.2000) (defining abortion as being other than to increase the probability of a live birth), 245.002(1) (defining abortion as being other than for the purpose of a live birth) (Vernon 1992).

4.  The Millers also sued the hospital, which was a subsidiary of HCA, Inc. in 1990. However, the trial court decided to try the claims against HCA prior to, and separately from those against the hospital. Accordingly, the

hospital was not a party at trial and is not a party to this appeal. Although HCA challenges the trial court's decision to try the claims against the hospital separately from those against HCA, our sustaining of HCA's issue regarding lack of tort duty makes it unnecessary for us to address that challenge.

5.  Liability was predicated on the jury's findings that: (1) the hospital performed resuscitative treatment on Sidney without Karla's or Mark's consent; and (2) the (unspecified) negligence of both the hospital and Columbia/HCA Healthcare Corporation proximately caused the occurrence in question. According to the Millers' brief, this negligence consisted of: (a) failing to have a policy that precluded treatment on a patient without consent; and (b) formulating and implementing a policy that required treatment without consent.

Although the Millers' did not sue any of the individual doctors involved, their assertion of liability against HCA was based in part on: (1) an alleged agency relationship between the hospital and Dr. Otero, the neonatologist who resuscitated Sidney; and (2) alter ego and single business enterprise theories whereby HCA was found liable for the acts of the hospital and, thus, Dr. Otero with whom the hospital was found to have

tered judgment in favor of the Millers in the amount of $29,400,000 in past and future medical expenses, $13,500,000 in punitive damages, and $17,503,066 in prejudgment interest.

### Existence of Tort Duty

Among other things, HCA challenges the imposition of tort liability against it in this case on the ground that it did not owe the Millers the tort duties that the Millers claim HCA breached. In particular, HCA argues that it could not be liable for battery or negligence in treating Sidney without the consent and against the instructions of the Millers because the doctor and hospital personnel who resuscitated Sidney were legally obligated to do so and because the Millers had no right to withhold life-sustaining medical treatment from Sidney. Because this issue is dispositive of the appeal, we address it first.

Although this issue has implications which extend well beyond the facts of this case, the parties have not cited and we have found no authority which directly addresses it. A resolution of the issue re-quires us to find a juncture between three fundamental but competing legal and policy interests.

■ On the one hand, Texas law expressly gives parents a right to consent to their children's medical care. *See* TEX. FAM.CODE ANN. § 151.003(a)(6) (Vernon 1996) (former version at TEX. FAM.CODE ANN. § 12.04(6)).[6] Thus, unless a child's need for life-sustaining medical treatment is too urgent for consent to be obtained from a parent or other person with legal authority (the "emergency exception"), a doctor's treatment of the child without such consent is actionable even if the condition requiring treatment would eventually be life-threatening and the treatment is otherwise provided without negligence. *See Moss v. Rishworth*, 222 S.W. 225, 226–27 (Tex. Comm'n App.1920, holding approved).[7] Obviously, the logical corollary of a right of consent is a right not to consent, *i.e.*, to refuse medical treatment. *See Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 270, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).[8] In addition, in

---

an agency relationship. Although HCA challenges the sufficiency of the evidence to establish the agency, alter ego, and single business enterprise theories, our sustaining of HCA's issue regarding lack of tort duty makes our addressing that challenge unnecessary as well.

In addition, although the Millers contend that the resuscitation performed on Sidney itself contributed to her impairment, they do not assert that the liability imposed against HCA was predicated on negligence in the *manner* that the resuscitation was performed but only in that it was performed at all, *i.e.*, without their consent and against their instructions. This is consistent with the fact that although the jury charge based HCA's liability, in part, on an agency relationship between the hospital and Dr. Otero, no question was submitted as to any negligence by Dr. Otero (or any other doctor).

**6.** The liberty interest of parents in the care, custody, and control of their children is also a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See, e.g., Troxel v. Granville*, 530 U.S. 57, 120 S.Ct.

2054, 2060, 147 L.Ed.2d 49 (2000). The Due Process Clause does not permit a State to infringe on this fundamental right of parents to make childrearing decisions simply because a state judge believes a "better" decision could be made. *See id.* at 2064.

**7.** *See also Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 269, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (noting that because every adult of sound mind has a right to determine what will be done with his body, a surgeon who performs an operation without a patient's consent is liable for assault); *Gravis v. Physicians & Surgeons Hosp.*, 427 S.W.2d 310, 311 (Tex.1968) ("In the absence of exceptional circumstances, ... a surgeon is subject to liability for assault and battery where he operates without the consent of the patient or the person legally authorized to give such consent.")

**8.** Depending on the circumstances, a parent's refusal of non-urgently needed or non-life-sustaining medical treatment for their child might legitimately be based, for example, on a desire to seek additional medical opinions on the treatment options or to select a different

Texas, the Advance Directives Act,[9] formerly the Natural Death Act [10] (collectively, the "Act"), allows parents to withhold or withdraw life-sustaining medical treatment from their child where the child's condition has been certified in writing by a physician to be terminal, *i.e.*, incurable or irreversible, and such that even providing life-sustaining treatment will only temporarily postpone death. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 166.002(13), 166.031, 166.035 (Vernon Supp.2000) (former versions at TEX. HEALTH & SAFETY CODE ANN. §§ 672.002, 672.003, 672.010).[11]

On the other hand, parents have a legal duty to provide needed medical care to their children. *See* TEX. FAM.CODE ANN. § 151.003(a)(3) (Vernon 1996) (former version at TEX. FAM.CODE ANN. § 12.04(3)). Thus, the failure of a parent to provide such care is a criminal offense when it causes injury or impairment to the child.[12]

The third competing legal and policy interest is that of the state, acting as *parens patriae*, to guard the well-being of minors, even where doing so requires limiting the freedom and authority of parents over their children. *See, e.g., Prince v. Massachusetts*, 321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *see also Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 627 & n. 13, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986). In addition, the state's authority over children's activities is broader than over like actions of adults. *See Prince*, 321 U.S. at 168, 64 S.Ct. 438. In other words, parents are not free to make all decisions for their children that they are free to make for themselves. *See id.*, at 170, 64 S.Ct. 438. Thus, for example, in Texas, the rights and duties of a parent are subject to a court order affecting those rights and duties,[13] including an

health care provider to administer the treatment.

**9.** *See* TEX. HEALTH & SAFETY CODE ANN. §§ 166.001–.166 (Vernon Supp.2000).

**10.** The provisions of the Natural Death Act, in effect at the time of Sidney's birth, have since been amended and recodified in the Advance Directives Act. *See* Act of June 14, 1989, 71st Leg., R.S., ch. 678, § 1, 1989 Tex. Gen. Laws 2982 (formerly TEX. HEALTH & SAFETY CODE ANN. §§ 672.001–.021), *amended & renumbered by* Act of June 18, 1999, 76th Leg., R.S., ch. 450, §§ 1.02–.03, 1999 Tex. Gen. Laws 2836 (current version at TEX. HEALTH & SAFETY CODE ANN. §§ 166.001.166 (Vernon Supp.2000)). However, the differences between these statutes are not material to the disposition of this appeal because it is not argued that the conditions for withholding or withdrawing medical treatment were satisfied in this case under either version, either at the time the Millers requested no resuscitation for Sidney, the time of her birth, or thereafter. Nor is it contended that the conditions that would have permitted the hospital to withhold treatment from Sidney under applicable federal regulations were met in this case, *i.e.*, that: (1) she was chronically and irreversibly comatose, (2) the provision of treatment would not have merely prolonged her dying, or (3) the provision of treatment would not have been effective in ameliorating or correcting all of Sidney's life threatening conditions. *See* 42 U.S.C. § 5106g(6) (Supp.2000).

**11.** Although Texas does so by way of the Act, states are not required to authorize anyone besides the individual patient to exercise that patient's right to refuse life-sustaining medical treatment. *See Cruzan*, 497 U.S. at 286–87, 110 S.Ct. 2841. The choice between life and death is obviously a deeply personal decision of overwhelming finality. *See id.* at 281, 110 S.Ct. 2841. Sustaining life maintains the status quo (albeit sometimes at tremendous financial and emotional cost). *See id.* at 283, 110 S.Ct. 2841. It keeps open the option to act on a change of heart, subsequent advancements in medical treatment, or natural improvement in a patient's medical condition. A decision to withhold life-sustaining medical treatment ends life permanently and irrevocably. The decision whether to do so in a particular case can obviously differ among those who are similarly afflicted, but the decision an infant might have made for herself about consenting to medical treatment under the circumstances cannot be known by others.

**12.** *See* TEX. PEN.CODE ANN. § 22.04(a), (b)(1) (Vernon Supp.2000); *Ahearn v. State*, 588 S.W.2d 327, 336–37 (Tex.Crim.App.1979); *Ronk v. State*, 544 S.W.2d 123, 124–25 (Tex. Crim.App.1976); *Fuentes v. State*, 880 S.W.2d 857, 860-61 (Tex.App.—Amarillo 1994, pet. ref'd).

**13.** *See* TEX. FAM.CODE ANN. § 151.003(d)(1) (Vernon 1996) (former version at TEX. FAM. CODE ANN. § 12.04).

order granting a governmental entity temporary conservatorship of a child with authority to consent to medical treatment refused by the child's parents.[14] *See* TEX. FAM.CODE ANN. §§ 102.003(a)(5), 105.001(a)(1), 262.201(c) (Vernon 1996 & Supp.2000) (former versions at TEX. FAM. CODE ANN. §§ 11.03(a)(5), 11.11(a)(1), 17.04(c)); *O.G. v. Baum*, 790 S.W.2d 839, 840–42 (Tex.App.—Houston [1st Dist.] 1990, orig. proceeding). Notably, however, it is not the health care provider who has the right or obligation to seek such court intervention, but the appropriate governmental agency, which the provider must notify in order for intervention to be sought pursuant to the State's interest in protecting the child. *See, e.g., In re Dubreuil*, 629 So.2d 819, 823–24 (Fla.1994). Therefore, until ordered to do otherwise by a court of competent jurisdiction, a health care provider's obligation is generally to comply with a patient's (or parent's) refusal of medical treatment. *See id.* at 823.

■ But does a parent have a right to deny urgently needed life-sustaining medical treatment to their child, *i.e.*, to decide, in effect, to let their child die? In Texas, the Legislature has expressly given parents a right to withhold medical treatment, urgently needed or not, for a child whose medical condition is certifiably terminal,[15] but it has not extended that right to the parents of children with non-terminal impairments, deformities, or disabilities, regardless of their severity.[16] In addition, although the Act expressly states that it does not impair or supersede any legal right a person may have to withhold or withdraw life-sustaining treatment in a

14. *Compare O.G. v. Baum*, 790 S.W.2d 839, 840–41 (Tex.App.—Houston [1st Dist.] 1990, orig. proceeding) (affirming appointment of child protective services as temporary custodian of minor after parents refused to consent on religious grounds to blood transfusion necessary for surgery to save arm); *Mitchell v. Davis*, 205 S.W.2d 812, 813–15 (Tex.Civ. App.—Dallas 1947, writ ref'd) (affirming award of custody of child to child welfare authorities when parent refused on religious grounds to take child to hospital for diagnosis of illness); *In re Cabrera*, 381 Pa.Super. 100, 552 A.2d 1114, 1120 (1989) (affirming appointment of hospital as guardian to consent to blood transfusion for child with sickle-cell anemia and high probability of recurrent strokes, with fatal complications, after parents refused to consent on religious grounds); *Custody of a Minor*, 375 Mass. 733, 379 N.E.2d 1053, 1066 (1978) (affirming appointment of guardian ad litem for child with leukemia to be treated with chemotherapy over parents' objections on finding that there was substantial chance of recovery with treatment, but certain death without treatment); *and In re McCauley*, 409 Mass. 134, 565 N.E.2d 411, 413–14 (1991) (affirming authorization to hospital to provide medical treatment to child because the best interests of the child and the interest of the state in protecting children's welfare, preserving life, and maintaining the ethical integrity of the medical profession outweighed the parents' parental and religious rights); *with Newmark v.*

*Williams*, 588 A.2d 1108, 1118 (Del.1991) (denying state's petition for custody of child with advanced and aggressive form of cancer where the proposed chemotherapy would be highly invasive and painful, involve terrible temporary and permanent side effects, and pose an unacceptably low chance of success and a high risk of itself causing death); *and In re Phillip B.*, 92 Cal.App.3d 796, 156 Cal. Rptr. 48, 52 (1979) (dismissing state's petition that a child with Down's Syndrome be declared a dependent of the court for purpose of allowing surgery for congenital heart defect because evidence in support of the petition was "inconclusive").

15. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 166.002(13), 166 .031, 166.035 (Vernon Supp.2000).

16. *Compare* TEX. HEALTH & SAFETY CODE ANN. § 170.002(a), (b) (Vernon Supp.2000) (allowing *abortion* of a viable unborn child during the third trimester of pregnancy where the fetus is diagnosed with severe and irreversible abnormality). Although a doctor who performs an abortion on a viable fetus in the third trimester must certify in writing the medical indications supporting his judgment that the abortion was authorized, the statute does not specify what types of abnormalities would be sufficient to comply with the statute. *See id.* § 170.002(c). As noted previously, abortion was not an option in this case due to Karla's infection. *See supra*, note 3.

lawful manner,[17] the parties have not cited and we have found no other statutory or common law authority allowing urgently needed life-sustaining medical treatment to be withheld from a non-terminally ill child by a parent.[18] To infer that parents have a general common law right to withhold such treatment from a non-terminally ill child would, in effect, mean that the Legislature has afforded greater protection to children who are terminally ill than to those who are not.[19] On the contrary, if anything, the state's interest in preserving life is greatest when life *can* be preserved and then weakens as the prognosis dims. *See Cruzan,* 497 U.S. at 270–71, 110 S.Ct. 2841.

More importantly, to infer that parents have a common law right to withhold urgently needed life-sustaining treatment from non-terminally ill children would pose imponderable legal and policy issues. For example, if parents *had* such a right, would it apply to otherwise healthy, normal children or only to those with some degree of abnormality? If the latter, which circumstances would qualify, which would not, and how could any such distinctions be justified legally? *See, e.g., Nelson v. Krusen,* 678 S.W.2d 918, 925

(Tex.1984) (recognizing the impossibility of making any calculation of the relative benefits of an impaired life versus no life at all). In light of the high value our law places on preserving human life, and especially on protecting the life and well-being of minors, we perceive no legal basis or other rationale for concluding that Texas law gives parents a common law right to withhold urgently needed life-sustaining medical treatment from children in circumstances in which the Act does not apply.[20] Moreover, in Texas, a child born alive after a premature birth (or abortion) is entitled to the same rights as are granted by the State to any other child born alive after normal gestation. *See* TEX. FAM.CODE ANN. § 151.004 (Vernon 1996) (former version at TEX. FAM.CODE ANN. § 12.05(a)).

Having recognized, as a general rule, that parents have no right to refuse urgently-needed life-sustaining medical treatment to their non-terminally ill children, a compelling argument can be made to carve out an exception for infants born so prematurely and in such poor condition that sustaining their life, even if medically possible, cannot be justified. To whatever extent such an approach would be preferable from a policy standpoint to having no

---

17. *See id.* § 166.051 (formerly § 672.021).

18. In the absence of any other authority allowing treatment to be withheld or withdrawn for another person, we interpret section 166.051 to refer to a competent adult's common law right to refuse medical treatment for himself.

19. Indeed, there would seem to be little reason for a parent to comply with the Act's procedures to certify that a terminally ill child is terminally ill if no such impediments applied to withholding treatment from a child who was not terminally ill or had not been certified as such.

20. In *Stolle,* the Stolles issued a written directive not to apply life-sustaining procedures to their brain-damaged child if her condition became terminal and such procedures would only artificially prolong the moment of her death. *See Stolle v. Baylor College of Med.,* 981 S.W.2d 709, 711 (Tex.App.—Houston [1st

Dist.] 1998, pet. denied). When the child ceased breathing after regurgitating food, a nurse administered chest compressions which ended the episode, and the child remained alive thereafter. *See id.* Suing only in their own behalf, the Stolles alleged that the defendants' disregard of their instructions resulted in further brain damage to their child, prolonged the child's life, and caused them extraordinary costs for the life of the child. *See id.* at 710. In affirming the trial court's summary judgment in favor of the health care providers, the First Court of Appeals reasoned that if the baby had been terminal, the defendants would have been immune from liability under the Natural Death Act, whereas if she was not terminal, she would not have satisfied the conditions for issuing a directive under that Act in the first place. *See id.* at 713. Implicit in the latter proposition is that if the child was not terminal, and thereby subject to the Natural Death Act, the parents had no right to withhold urgently needed life-sustaining medical treatment from her.

such exception, and to whatever extent such an approach is available to the Legislature or a higher court, we do not believe it is an alternative available to this court because: (1) a sufficient record does not exist in this case to identify where to "draw the line" for such an exception; and, more importantly, (2) it is not within the province of an intermediate appellate court to, in effect, legislate in that manner.

To the extent a parent's right to refuse urgently-needed life-sustaining medical treatment for their child exists only under the Act, *i.e.*, only where the child's condition is certifiably terminal, it logically follows that this right does not exist and cannot be exercised until a child's condition can be evaluated adequately to determine whether the condition is indeed terminal. Correspondingly, to the extent a child's condition has not been certified as terminal, a health care provider is under no duty to follow a parent's instruction to withhold urgently-needed life-sustaining medical treatment from their child.[21]

In a situation where non-urgently needed or non-life-sustaining medical treatment is proposed for a child, a court order is needed to override a parent's refusal to consent to the treatment because a determination of such issues as the child's safety, welfare, and best interest can vary under differing circumstances and alternatives. By contrast, where life-sustaining medical treatment is urgently needed, time constraints will often not permit resort to the courts. Where the need for such treatment can be anticipated before it becomes acute, the circumstances might allow the parents to remove the child from the health provider's care; and, under existing legal principles, the treatment cannot lawfully be provided without consent before the need for it becomes acute in any event. However, where the need for life-sustaining medical treatment is or becomes urgent while a non-terminally ill child is under a health care provider's care, and where the child's parents refuse consent to that treatment, we do not believe that a court order is necessary to override that refusal because no legal or factual issue exists for a court to decide regarding the provision of such treatment.[22] This is because: (1) a court cannot decide the issue of impairment versus no life at all;[23] and, thus, (2) a court could not conclude that the parents were entitled to withhold the treatment if the child's condition is not terminal.

In this case, the Millers had a right to refuse urgently needed life-sustaining medical treatment for Sidney only to the extent that her condition was certifiably terminal and other requirements of the Act were satisfied. Although there was considerable doubt that Sidney would be born alive at all and that, if and when born alive, she could be kept alive, there is no evidence that her condition before or after birth was (or could have been) certified as terminal. In addition, the record is clear that at the time Sidney was born, her need for life-sustaining procedures was urgent. Following her birth, Sidney's condition proved, with the efforts of her doctors, not to be terminal. Under these circumstances, the Millers had no right to deny the urgently needed life-sustaining medical treatment to Sidney, and no court order was needed to overcome their refusal to consent to it.

21. Provided it is subsequently born alive, even an unborn fetus is a "patient" to whom a doctor treating the mother owes a duty of care. *See Brown v. Shwarts*, 968 S.W.2d 331, 334 (Tex.1998).

22. *Cf. Parents United for Better Schools v. School Dist. of Phil. Bd.*, 978 F.Supp. 197, 206 (E.D.Pa.1997) (recognizing that under the common law, parental consent may be impliedly waived when a parent's refusal to consent would likely compromise the minor's long-term prospects for health and well-being).

23. *See Nelson*, 678 S.W.2d at 925.

Based on the foregoing, we sustain HCA's contentions that it did not owe the Millers a tort duty to: (a) refrain from resuscitating Sidney; (b) have no policy requiring resuscitation of patients like Sidney without consent; and (c) have policies prohibiting resuscitation of patients like Sidney without consent. However, before concluding this opinion, we will briefly discuss a few additional authorities which have been extensively briefed by the parties but which we do not believe bear on the disposition of the controlling issue of duty.

## Other Authorities

In *Nelson* and *Jacobs,* the Texas Supreme Court recognized that if a doctor fails to diagnose and advise parents of a medical condition of the pregnant mother that could cause adverse consequences to the fetus, and the parents would have terminated the pregnancy had they been properly advised by the doctor, then the parents have a right to recover from the doctor the expenses for care and treatment of their child for the child's "wrongful birth." *See Nelson,* 678 S.W.2d at 919; *Jacobs v. Theimer,* 519 S.W.2d 846, 847 (Tex.1975). To this extent, *Nelson* and *Jacobs* are distinguishable from this case in that there is no claim here that any health care provider's failure to advise Karla and Mark of any medical condition caused them to forego electing to have an abortion. Moreover, unlike the Jacobs and Nelsons, who were assumed to have had a legal right to *prevent* the births of their children had they been correctly advised, the Millers did not seek to prevent Sidney's birth in this case and, as discussed above, did not have a legal right to deny Sidney urgently-needed life-sustaining medical treatment once she was born.

Therefore, a claim for wrongful birth does not exist in this case and is not instructive to our disposition.

In addition to addressing the wrongful birth claim, *Nelson* further concluded that a corresponding cause of action on behalf of the child for "wrongful life" did not exist. *See* 678 S.W.2d at 924–25. The principal reason for this holding was the impossibility of rationally determining whether the child had actually been damaged by the birth because to do so would require weighing the relative benefits *to her* of an impaired life versus no life at all. *See id.* at 925. As noted in the preceding section, the fact that such a legal determination cannot be made led us to conclude that a court order is not necessary to override the refusal of a parent to consent to urgently-needed life-sustaining medical treatment for a child. Beyond that, however, because damages were not awarded to Sidney in this case on a theory of wrongful life (or otherwise), the holding of *Jacobs* with regard to a claim for wrongful life is not pertinent to our analysis.

Lastly, the parties have cited various federal statutes, regulations, and court opinions pertaining to conditions imposed on states and health care providers in order to receive federal funding for child abuse prevention and treatment programs.[24] Although each side argues that various portions of these federal authorities support their position, neither side has cited, and we have not found, any indication that the federal law either establishes parents' rights to consent to or refuse medical treatment for their children or preempts state law in that regard. Therefore, we conclude that the disposition of

24. *See, e.g.,* 42 U.S.C. 5101–5107 (1995 & Supp.2000); 45 C.F.R. 1340.1–1340.20 (2000); *see generally* Kate H. Lind, *Medical Treatment Decisionmaking for Seriously Handicapped Infants: Is There a Role for the Federal Government?,* 29 B.C. L.Rev. 715 (1988); Steven R. Smith, *Disabled Newborns and the Federal Child Abuse Amendments: Tenuous Protection,* 37 Hastings L.J. 765 (1986); Steven R. Smith, *Life and Death Decisions in the Nursery: Standards and Procedures for Withholding Lifesaving Treatment from Infants,* 27 N.Y.L. Sch. L.Rev. 1125 (1982); Yolanda V. Vorys, Comment, *The Outer Limits of Parental Autonomy: Withholding Medical Treatment from Children,* 42 Ohio St. L.J. 813 (1981).

this case is governed by state law rather than federal funding authorities.

## Conclusion

In light of our determination that HCA did not owe the Millers the tort duties upon which liability was predicated in this case, it is not necessary for us to address HCA's remaining issues. Accordingly, the judgment of the trial court is reversed, and judgment is rendered that the Millers take nothing on their claims against HCA.

MAURICE E. AMIDEI, Justice, dissenting.

I respectfully dissent.

The majority erroneously concludes that a court order was not needed to override the parents' refusal to consent to the resuscitation treatment. I have found no authority to support the majority's conclusion. The Pennsylvania case cited, *Parents United for Better Schools v. School Dist. of Philadelphia,* 978 F.Supp. 197, 206 (E.D.Pa.1997), would only apply in a case where the parents' refusal to consent would likely compromise the minor's long-term prospects for health and well-being. In this case, it was established that the parents refusal to consent would not have likely compromised the minor's long-term prospect for health and well being.

The other case cited, *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984), does not support the proposition because it only concluded there was no cause of action in Texas for wrongful life by the surviving child because it was impossible to rationally decide whether that the plaintiff had been damaged at all. The *Nelson* case upheld the parents' cause of action for "wrongful birth", under which parents may recover the expenses necessary for the care and treatment of a child's physical impairment proximately caused by the negligence of a physician. *See id.* at 923–24 citing *Jacobs v. Theimer,* 519 S.W.2d

846 (Tex.1975). The court reasoned that the damages were easier to calculate with less speculation involved in a "wrongful birth" case than in a "wrongful life" case. *See id.* at 924.

I disagree with the majority's conclusion that under these circumstances, a court order is not necessary to override the parents' refusal to consent because no legal or factual issue existed for the court to decide regarding the provision of such treatment. The court must decide the most important issue: What is in the best interest of the child? A court decision in favor of the resuscitation would afford the physician and hospital the consent necessary to treat the newborn infant. In the interest of justice, having a court hear the matter would have provided an impartial tribunal without any conflict of interest or appearance of conflict of interest to decide the matter.

The majority concludes that the Millers could only refuse to consent pursuant to the provisions of the Advance Directives Act,[1] formerly the Natural Death Act.[2] That is, assuming Sidney's condition was not certifiably terminal before or after birth, the requirements of that act could not be met, and no court order was needed to overcome the Miller's refusal to consent. This is an incorrect interpretation of the Act. The majority erroneously concludes that the resuscitation was urgently needed and the time constraints did not permit resort to the courts. The Act is not mandatory and the Millers were not required to seek a directive thereunder. Actually, the Act expressly allowed, and did not deny, the Millers the right or responsibility to effect the withholding or withdrawal of life sustaining procedures in a lawful manner, whether a directive was obtained or not. *See* TEX. HEALTH & SAFETY CODE ANN. § 672.021 (Vernon 1992) (providing that "[t]his chapter does not impair or supersede any legal right or responsibility

---

1. TEX. HEALTH & SAFETY CODE ANN. § 166.001–.166 (Vernon Supp.2000).

2. TEX. HEALTH & SAFETY CODE ANN. § 672.001–.021 (Vernon Supp.1992)

a person may have to effect the withholding or withdrawal of life sustaining procedures in a lawful manner.").

The course the Millers took was lawful, and protected by the United States Constitution. *See Bowen v. American Hosp. Assoc.,* 476 U.S. 610, 627 n. 13,630, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (holding that health care providers abide by parental decisions or seek state intervention). A discussion of the Natural Death Act, and whether the Acts' definition of "Terminal Condition" could have or should have applied to this case is not relevant to the issues in this case.

The majority repeatedly refers to "urgently needed life sustaining treatment" and to the "emergency exception" without explaining how we can hold the "emergency exception" applies without a jury finding on the issue. I would hold as a matter of law there was no emergency. In *Moss v. Rishworth,* 222 S.W. 225 (Tex.Comm. App.1920), the court, held no emergency existed in upholding the Court of Appeals reversal of a jury verdict in favor of a physician. The Court stated in pertinent part:

> The Law wisely reposes in the parent the care and custody of the minor child, and neither a physician nor those in temporary custody of the child will be permitted, in a case of this character (*i.e. no emergency* ), to determine those matters touching its welfare.

*Id.* 227 (Emphasis supplied).

Appellants had alternative courses available to them early on. Particularly, the course of withholding life support (no resuscitation), as first suggested by the Millers' doctors, and with which the Millers agreed, could have been accomplished by a simple change of doctors. Another doctor holding a different opinion could have delivered the baby and not applied resuscitation. The appellants did not suggest to the Millers they could change doctors. There was ample time during which the

appellants met and decided their chosen course of action without obtaining the Millers' consent. The urgency, if any, was due to the appellants' indecision and delay. Eleven hours elapsed after the Millers informed their doctors they wanted to take their original advice and not resuscitate the baby, if born alive. The appellants decided there was going to be resuscitation and performed it knowing the Millers were there and available to consult regarding the consent. This was not a medical emergency which excuses not having a consent.[3] A true medical emergency is where a doctor must operate and no one is available to give the proper consent. The Millers were present in the hospital at all times leading up to the birth and resuscitation, but appellants chose not to try to change the Miller minds, change doctors, or try to obtain a court order. Anytime a group of doctors and a hospital administration has the luxury of multiple meetings to change the original doctors' medical opinions, without taking a more obvious course of action, there is no medical emergency.

In the event there was no emergency as a matter of law, it was still the appellant's burden to plead and prove as a defense an emergency or circumstances requiring the immediate resuscitative procedure without consent of the Millers. *See Gravis v. Physicians & Surgeons Hospital of Alice,* 427 S.W.2d 310 (Tex.1968). No defense questions were submitted to the jury. Specifically no question as to an emergency which would excuse having no consent was requested. *See* TEX.R.CIV.P. Rule 273. Appellant's have not raised any issue regarding an emergency jury question on appeal. Therefore, we cannot consider whether an emergency existed which would imply consent and, in effect, deem the issue in favor appellants. Appellants waived the issue.

The resulting conflict could have and should have been avoided by the appellants. Appellants were not entitled to immunity or a deemed finding that an emergency existed to excuse obtaining a

---

3. TEX.REV.CIV.STAT.ANN. art. 4590i, § 6.07(a)(2)   (Vernon Supp .2000)

consent. I would overrule appellants' issues, and affirm the trial court.