**Sidney Ainsley MILLER, by and Through Her Next Friend Karla H. MILLER, and Karla H. Miller and J. Mark Miller, Individually**

v.

**HCA, INC., HCA–Hospital Corporation of America, Hospital Corporation of America and Columbia/HCA Healthcare Corporation.**

No. 01–0079.

Supreme Court of Texas.

Argued April 3, 2002.

Decided Sept. 30, 2003.

Rehearing Denied Nov. 21, 2003.

David Keltner, Fort Worth, Michael D. Sydow, Sydow, Kormanik, Carrigan, L.L.P., Houston, Murray Fogler, McDade Fogler Maines, L.L.P., Houston, Karen S. Precella, Haynes & Boone, L.L.P., Fort Worth, for petitioners.

Marc O. Knisely, Patricia D. Pope, McGinnis Lochridge & Kilgore, L.L.P.,

Austin, Richard L. Rothfelder, Michael C. Falick, Rothfelder & Falick, L.L.P., Houston, Mike A. Hatchell, Molly H. Hatchell, Hatchell P.C., Tyler, John S. Serpe, Richard A. Sheehy, Sheehy, Serpe & Ware, P.C., Houston, Shannon H. Ratliff, Ratliff Law Firm, P.L.L.C., Austin, for respondents.

Justice ENOCH delivered the opinion of the Court.

The narrow question we must decide is whether Texas law recognizes a claim by parents for either battery or negligence because their premature infant, born alive but in distress at only twenty-three weeks of gestation, was provided resuscitative medical treatment by physicians at a hospital without parental consent. The court of appeals, with one justice dissenting, held that neither claim could be maintained as a matter of law because parents have no right to refuse urgently-needed life-sustaining medical treatment for their child unless the child's condition is "certifiably terminal" under the Natural Death Act [1] (now the Advance Directives Act).[2] And here it is undisputed that the Millers' newborn infant was not "certifiably terminal."

Although we agree with the court of appeals' judgment, our reasoning differs somewhat. First, there is no dispute in the evidence that the Millers' premature infant could not be fully evaluated for medical treatment until birth. As a result, any decisions concerning treatment for the Millers' child would not be fully informed decisions until birth. Second, the evidence further established that once the infant was born, the physician attending the birth was faced with emergent circumstances—

*i.e.*, the child might survive with treatment but would likely die if treatment was not provided before either parental consent or a court order overriding the withholding of such consent could be obtained.

We hold that circumstances like these provide an exception to the general rule imposing liability on a physician for treating a child without consent. That exception eliminates the Millers' claim for battery. We further conclude that the Millers' negligence claim—premised not on any physician's negligence in treating the infant but on the hospital's policies, or lack thereof, permitting a physician to treat their infant without parental consent—fails as a matter of law for the same reasons. We accordingly affirm the court of appeals' judgment.

## I. Facts

The unfortunate circumstances of this case began in August 1990, when approximately four months before her due date, Karla Miller was admitted to Woman's Hospital of Texas (the "Hospital") in premature labor. An ultrasound revealed that Karla's fetus weighed about 629 grams or 1 1/4 pounds and had a gestational age of approximately twenty-three weeks. Because of the fetus's prematurity, Karla's physicians began administering a drug designed to stop labor.

Karla's physicians subsequently discovered that Karla had an infection that could endanger her life and require them to induce delivery. Dr. Mark Jacobs, Karla's obstetrician, and Dr. Donald Kelley, a neonatologist at the Hospital, informed Karla and her husband, Mark Miller, that if they had to induce delivery, the infant had little

---

1. Act of June 14, 1989, 71st Leg., R.S., ch. 678, § 1, 1989, Tex. Gen. Laws 2982 (formerly Tex. HEALTH & SAFETY CODE §§ 672.002–.021), *amended & renumbered by* Act of June 18, 1999, 76th Leg., R.S., ch. 450, §§ 1.02–.03,

1999 Tex. Gen. Laws 2836 (current version at Tex. HEALTH & SAFETY CODE §§ 166.001–.166).

2. 36 S.W.3d 187, 195.

chance of being born alive. The physicians also informed the Millers that if the infant was born alive, it would most probably suffer severe impairments, including cerebral palsy, brain hemorrhaging, blindness, lung disease, pulmonary infections, and mental retardation. Mark testified at trial that the physicians told him they had never had such a premature infant live and that anything they did to sustain the infant's life would be guesswork.

After their discussion, Drs. Jacobs and Kelley asked the Millers to decide whether physicians should treat the infant upon birth if they were forced to induce delivery. At approximately noon that day, the Millers informed Drs. Jacob and Kelley that they wanted no heroic measures performed on the infant and they wanted nature to take its course. Mark testified that he understood heroic measures to mean performing resuscitation, chest massage, and using life support machines. Dr. Kelley recorded the Millers' request in Karla's medical notes, and Dr. Jacobs informed the medical staff at the Hospital that no neonatologist would be needed at delivery. Mark then left the Hospital to make funeral arrangements for the infant.

In the meantime, the nursing staff informed other Hospital personnel of Dr. Jacobs' instruction that no neonatologist would be present in the delivery room when the Millers' infant was born. An afternoon of meetings involving Hospital administrators and physicians followed. Between approximately 4:00 p.m. and 4:30 p.m. that day, Anna Summerfield, the director of the Hospital's neonatal intensive care unit, and several physicians, including Dr. Jacobs, met with Mark upon his return to the Hospital to further discuss the situation. Mark testified that Ms. Summerfield announced at the meeting that the Hospital had a policy requiring resuscitation of any baby who was born weighing

over 500 grams. Although Ms. Summerfield agreed that she said that, the only written Hospital policy produced described the Natural Death Act and did not mention resuscitating infants over 500 grams.

Moreover, the physicians at the meeting testified that they and Hospital administrators agreed only that a neonatologist would be present to evaluate the Millers' infant at birth and decide whether to resuscitate based on the infant's condition at that time. As Dr. Jacobs testified:

> [W]hat we finally decided that everyone wanted to do was to not make the call prior to the time we actually saw the baby. Deliver the baby, because you see there was this [question] is the baby really 23 weeks, or is the baby further along, how big is the baby, what are we dealing with. We decided to let the neonatologist make the call by looking directly at the baby at birth.

Another physician who attended the meeting agreed, testifying that to deny any attempts at resuscitation without seeing the infant's condition would be inappropriate and below the standard of care.

Although Dr. Eduardo Otero, the neonatologist present in the delivery room when Sidney was born, did not attend that meeting, he confirmed that he needed to actually see Sidney before deciding what treatment, if any, would be appropriate:

> Q. Can you ... tell us from a worst case scenario to a best case scenario, what type of possibilities you've seen in your own personal practice?
>
> A. Well, the worst case scenario is ... the baby comes out and it's dead, it has no heart rate.... Or you have babies that actually go through a rocky start then cruise through the rest and go home. And they may have small handicaps or they may have some problems but—learning disabilities or something like that,

but in general, all babies are normal children or fairly normal children.

Q. And is there any way that you could have made a prediction, at the time of Sidney's birth, where she would fall in that range of different options?

A. No, sir.

Q. Is there any way that you can make that decision, as to whether the newborn infant will be viable or not in a case such as Sidney's, before the time of delivery, an assessment at the time of delivery?

A. No.

Mark testified that, after the meeting, Hospital administrators asked him to sign a consent form allowing resuscitation according to the Hospital's plan, but he refused. Mark further testified that when he asked how he could prevent resuscitation, Hospital administrators told him that he could do so by removing Karla from the Hospital, which was not a viable option given her condition. Dr. Jacobs then noted in Karla's medical charts that a plan for evaluating the infant upon her birth was discussed at that afternoon meeting.

That evening, Karla's condition worsened and her amniotic sac broke. Dr. Jacobs determined that he would have to augment labor so that the infant would be delivered before further complications to Karla's health developed. Dr. Jacobs accordingly stopped administering the drug to Karla that was designed to stop labor, substituting instead a drug designed to augment labor. At 11:30 p.m. that night, Karla delivered a premature female infant weighing 615 grams, which the Millers named Sidney. Sidney's actual gestational age was twenty-three and one-seventh weeks. And she was born alive.

Dr. Otero noted that Sidney had a heart beat, albeit at a rate below that normally found in full-term babies. He further noted that Sidney, although blue in color and limp, gasped for air, spontaneously cried, and grimaced. Dr. Otero also noted that Sidney displayed no dysmorphic features other than being premature. He immediately "bagged" and "intubated" Sidney to oxygenate her blood; he then placed her on ventilation. He explained why:

Because this baby is alive and this is a baby that has a reasonable chance of living. And again, this is a baby that is not necessarily going to have problems later on. There are babies that survive at this gestational age that—with this birth weight, that later on go on and do well.

Neither Karla nor Mark objected at the time to the treatment provided.

Sidney initially responded well to the treatment, as reflected by her Apgar scores. An Apgar score records five different components of a new-born infant: respiratory effort, heart rate, reflex activity, color, and muscle tone.[3] Each component gets a score of zero, one, or two, with a score of two representing the best condition.[4] Sidney's total Apgar score improved from a three at one minute after birth to a six at five minutes after birth. But at some point during the first few days after birth, Sidney suffered a brain hemorrhage—a complication not uncommon in infants born so prematurely.

There was conflicting testimony about whether Sidney's hemorrhage occurred because of the treatment provided or in spite of it. Regardless of the cause, as predict-

3. *Cruz ex rel. Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 642 n. 16 (Tex.App.-El Paso 2001, pet. denied).

4. *Id.*

ed by Karla's physicians, the hemorrhage caused Sidney to suffer severe physical and mental impairments. At the time of trial, Sidney was seven years old and could not walk, talk, feed herself, or sit up on her own. The evidence demonstrated that Sidney was legally blind, suffered from severe mental retardation, cerebral palsy, seizures, and spastic quadriparesis in her limbs. She could not be toilet-trained and required a shunt in her brain to drain fluids that accumulate there and needed care twenty-four hours a day. The evidence further demonstrated that her circumstances will not change.

The Millers sued HCA, Inc., HCA–Hospital Corporation of America, Hospital Corporation of America, and Columbia/HCA Healthcare Corporation (collectively, "HCA"), and the Hospital, a subsidiary of HCA. They did not sue any physicians, including Dr. Otero, the physician that actually treated Sidney. Instead, the Millers asserted battery and negligence claims only against HCA and the Hospital.

The Millers' claims stemmed from their allegations that despite their instructions to the contrary, the Hospital not only resuscitated Sidney but performed experimental procedures and administered experimental drugs, without which, in all reasonable medical probability, Sidney would not have survived. The Millers also alleged that the Hospital's acts and/or omissions were performed with HCA's full knowledge and consent. Although the Millers did not sue Dr. Otero, they alleged that he and other Hospital personnel were the Hospital's apparent or ostensible agents.

The Millers alleged that the Hospital, HCA, Inc., and Hospital Corporation of America were alter egos of or business conduits created and maintained for impermissible purposes by HCA–Hospital Corporation of America. The Millers further alleged that the Hospital, HCA, Inc., and Hospital Corporation of America integrated their resources to achieve a common business enterprise. Thus, the Millers asserted that the HCA defendants were jointly and severally liable. The trial court granted HCA's motion for a separate trial from the Hospital and then, at the Millers' request, tried the Millers' claims against HCA first.

Though the Hospital was not a party at the trial against HCA, the trial court submitted questions to the jury about the Hospital's conduct. The jury found that the Hospital, without the consent of Karla or Mark Miller, performed resuscitative treatment on Sidney. The jury also found that the Hospital's and HCA's negligence "proximately caused the occurrence in question." The jury concluded that HCA and the Hospital were grossly negligent and that the Hospital acted with malice. The jury also determined that Dr. Otero acted as the Hospital's agent in resuscitating Sidney and that HCA was responsible for the Hospital's conduct under alter ego and single business enterprise theories. The trial court rendered judgment jointly and severally against the HCA defendants on the jury's verdict of $29,400,000 in actual damages for medical expenses, $17,503,066 in prejudgment interest, and $13,500,000 in exemplary damages.

HCA appealed. The court of appeals, with one justice dissenting, reversed and rendered judgment that the Millers take nothing. The court concluded that the Texas Legislature allowed parents to withhold medical treatment, urgently needed or not, for a child whose medical condition is certifiably terminal under the Natural

Death Act.[5] But the court held that the Legislature had not extended that right to parents of children with non-terminal impairments, deformities, or disabilities, regardless of their severity.[6]

The court acknowledged that the Natural Death Act did not "impair or supersede any legal right a person may have to withhold or withdraw life-sustaining treatment in a lawful manner."[7] But the court noted that the parties had not cited, and the court did not find, any authority allowing a parent to withhold urgently-needed life-sustaining medical treatment from a non-terminally ill child. Thus, the court concluded that, to the extent an infant's condition is not certified as terminal, a health care provider is under no duty to follow a parent's instruction to withhold urgently-needed life-sustaining medical treatment.[8]

The court noted that when non-urgently-needed or non-life-sustaining medical treatment is proposed for a child, a court order is needed to override a parent's refusal to consent to the treatment because a determination of such issues as the child's safety, welfare, and best interest can vary under differing circumstances and alternatives.[9] But the court held that when the need for life-sustaining medical treatment is or becomes urgent while a non-terminally ill child is under a health care provider's care, and when the child's parents refuse consent to treatment, a court order is un-necessary to override that refusal.[10] According to the court, no legal or factual issue exists to decide about providing such treatment because a court cannot decide between impaired life versus no life at all.[11]

Given this backdrop, the court concluded that the Millers had no right to deny the medical treatment given to Sidney and that no court order was necessary to overcome their refusal to consent.[12] Thus, the court sustained HCA's contentions that it did not owe the Millers a tort duty to: (a) refrain from resuscitating Sidney; (b) have no policy requiring resuscitation of patients like Sidney without consent; and (c) have policies prohibiting resuscitation of patients like Sidney without consent.[13]

The dissenting justice disagreed that no court order was necessary to override the Millers' refusal to consent.[14] According to the dissent, a court must decide the most important issue: What is in the best interest of the child?[15] The dissent concluded that a court decision in favor of resuscitation would afford the physician and the Hospital the consent necessary to treat Sidney.[16] The dissent further concluded that the Natural Death Act was not mandatory and the Millers were not required to seek a directive under the Act.[17] The dissent would have affirmed the trial court's judgment.[18]

We granted the Millers' petition for review to consider this important and diffi-

---

5. 36 S.W.3d at 193.

6. *Id.*

7. *Id.* at 193–94; *see* TEX. HEALTH & SAFETY CODE § 166.051.

8. 36 S.W.3d at 195.

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.* at 196.

14. *Id.* at 197.

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.* at 199.

cult matter. In addition to briefing from the parties, we received several amici briefs, some supporting the Millers' position and some supporting HCA's position.

## II. Analysis

This case requires us to determine the respective roles that parents and health-care providers play in deciding whether to treat an infant who is born alive but in distress and is so premature that, despite advancements in neonatal intensive care, has a largely uncertain prognosis. Although the parties have cited numerous constitutional provisions, statutes, and cases, we conclude that neither the Texas Legislature nor our case law has addressed this specific situation. We accordingly begin our analysis by focusing on what the existing case law and statutes do address.

■■■ Generally speaking, the custody, care, and nurture of an infant resides in the first instance with the parents.[19] As the United States Supreme Court has acknowledged, parents are presumed to be the appropriate decision-makers for their infants:

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obli-

gations." ... Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.[20]

The Texas Legislature has likewise recognized that parents are presumed to be appropriate decision-makers, giving parents the right to consent to their infant's medical care and surgical treatment.[21] A logical corollary of that right, as the court of appeals here recognized, is that parents have the right not to consent to certain medical care for their infant, i.e., parents have the right to refuse certain medical care.[22]

■■■ Of course, this broad grant of parental decision-making authority is not without limits. The State's role as *parens patriae* permits it to intercede in parental decision-making under certain circumstances. As the United States Supreme Court has noted:

> [A]s persons unable to protect themselves, infants fall under the parens patriae power of the state. In the exercise of this authority, the state not only punishes parents whose conduct has amounted to abuse or neglect of their children but may also supervene parental decisions before they become operative to ensure that the choices made are

---

19. *See Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

20. *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (citations omitted).

21. TEX. FAM.CODE § 151.001(a)(6).

22. 36 S.W.3d at 191; *see Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 270, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

not so detrimental to a child's interests as to amount to neglect and abuse.[23] But the Supreme Court has also pointed out:

> [A]s long as parents choose from professionally accepted treatment options the choice is rarely reviewed in court and even less frequently supervened. The courts have exercised their authority to appoint a guardian for a child when the parents are not capable of participating in the decisionmaking or when they have made decisions that evidence substantial lack of concern for the child's interests.[24]

The Texas Legislature has acknowledged the limitations on parental decisionmaking. For example, the Legislature has provided in the Family Code that the rights and duties of parents are subject to modification by court order.[25] And Texas courts have recognized their authority to enter orders, under appropriate circumstances, appointing a temporary managing conservator who may consent to medical treatment refused by a child's parents.[26]

■■ With respect to consent, the requirement that permission be obtained before providing medical treatment is based on the patient's right to receive information adequate for him or her to exercise an informed decision to accept or refuse the treatment.[27] Thus, the general rule in

Texas is that a physician who provides treatment without consent commits a battery.[28] But ·there are exceptions. For example, in *Gravis v. Physicians & Surgeons Hospital*, this Court acknowledged that "consent will be implied where the patient is unconscious or otherwise unable to give express consent and an immediate operation is necessary to preserve life or health." [29]

In *Moss v. Rishworth*, the court held that a physician commits a "legal wrong" by operating on a minor without parental consent when there is "an absolute necessity for a prompt operation, but not emergent in the sense that death would likely result immediately upon the failure to perform it." [30] But the court in *Moss* expressly noted that "it [was] not contended [there] that any real danger would have resulted to the child had time been taken to consult the parent with reference to the operation." [31] *Moss* therefore implicitly acknowledges that a physician does not commit a legal wrong by operating on a minor without consent when the operation is performed under emergent circumstances—*i.e.*, when death is likely to result immediately upon the failure to perform it.[32]

*Moss* guides us here. We hold that a physician, who is confronted with emergent circumstances and provides life-sus-

---

**23.** *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 627 n. 13, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (citation omitted).

**24.** *Id.*

**25.** Tex. Fam.Code § 151.001(d)(1).

**26.** *See, e.g., O.G. v. Baum*, 790 S.W.2d 839, 840–41 (Tex.App.-Houston [1st Dist.] 1990, orig. proceeding); *Mitchell v. Davis*, 205 S.W.2d 812, 813–15 (Tex.Civ.App.-Dallas 1947, writ ref'd).

**27.** *See Wilson v. Scott*, 412 S.W.2d 299, 301 (Tex.1967).

**28.** *Gravis v. Physicians & Surgeons Hosp.*, 427 S.W.2d 310, 311 (Tex.1968); *see Moss v. Rishworth*, 222 S.W. 225, 226–27 (Tex. Comm'n App.1920, judgm't approved).

**29.** *Gravis*, 427 S.W.2d at 311.

**30.** 222 S.W. at 226.

**31.** *Id.*

**32.** *See id.*

taining treatment to a minor child, is not liable for not first obtaining consent from the parents. The Millers cite to Texas Family Code section 32.001,[33] Texas Health & Safety Code section 773.008,[34] and Texas Revised Civil Statutes article 4590i, section 6.07(a)(2),[35] as illustrating that implied consent does not arise from an emergency context when a healthcare provider has actual notice of lack of consent. Because these statutes apply when a parent is not present to consent, the Millers suggest that this must mean that emergency services cannot be provided when the parents refuse consent. But that is not so.

■ Providing treatment to a child under emergent circumstances does not imply consent to treatment despite actual notice of refusal to consent. Rather, it is an exception to the general rule that a physician commits a battery by providing medical treatment without consent. As such, the exception is narrowly circumscribed and arises only in emergent circumstances when there is no time to consult the parents or seek court intervention if the parents withhold consent before death is likely to result to the child. Though in situations of this character, the physician should attempt to secure parental consent if possible, the physician will not be liable under a battery or negligence theory solely for proceeding with the treatment absent consent.[36]

We recognize that the Restatement (Second) of Torts § 892D provides that an individual is not liable for providing emergency treatment without consent if that individual has no reason to believe that the other, if he or she had the opportunity to consent, would decline.[37] But that requirement is inapplicable here because, as we have discussed, the emergent circumstances exception does not imply consent.

■ Further, the emergent circumstances exception acknowledges that the harm from failing to treat outweighs any harm threatened by the proposed treatment,[38] because the harm from failing to provide life-sustaining treatment under emergent circumstances is death. And as we acknowledged in *Nelson v. Krusen,* albeit in the different context of a wrongful life claim, it is impossible for the courts to calculate the relative benefits of an impaired life versus no life at all.[39]

■ Following these guiding principles, we now determine whether the Millers can maintain their battery and negligence claims against HCA. The jury found that the Hospital, through Dr. Otero, treated Sidney without the Millers' consent. The parties do not challenge that finding. Thus, we only address whether the Hospital was required to seek court intervention to overturn the lack of parental consent—which it undisputedly did not do—before Dr. Otero could treat Sidney without committing a battery.

The Millers acknowledge that numerous physicians at trial agreed that, absent an emergency situation, the proper course of action is court intervention when health care providers disagree with parents' refusal to consent to a child's treatment. And the Millers contend that, as a matter

---

**33.** Tex. Fam.Code § 32.001.

**34.** Tex. Health & Safety Code § 773.008(3).

**35.** Tex.Rev.Civ. Stat. art. 4590i, § 6.07(a)(2).

**36.** *Cf. Canterbury v. Spence,* 464 F.2d 772, 788–89 (D.C.Cir.1972).

**37.** Restatement (Second) of Torts § 892D(b) (1979).

**38.** *Cf. Canterbury,* 464 F.2d at 788.

**39.** 678 S.W.2d 918, 925 (Tex.1984).

of law, no emergency existed that would excuse the Hospital's treatment of Sidney without their consent or a court order overriding their refusal to consent. The Millers point out that before Sidney's birth, Drs. Jacobs and Kelley discussed with them the possibility that Sidney might suffer from the numerous physical and mental infirmities that did, in fact, afflict her. And some eleven hours before Sidney's birth, the Millers indicated that they did not want any heroic measures performed on Sidney. The Millers note that these factors prompted the dissenting justice in the court of appeals to conclude that "[a]nytime a group of doctors and a hospital administration ha[ve] the luxury of multiple meetings to change the original doctors' medical opinions, without taking a more obvious course of action, there is no medical emergency." [40]

We agree that a physician cannot create emergent circumstances from his or her own delay or inaction and escape liability for proceeding without consent. But the Millers' reasoning fails to recognize that, in this case, the evidence established that Sidney could only be properly evaluated when she was born. Any decision the Millers made before Sidney's birth concerning her treatment at or after her birth would necessarily be based on speculation. Therefore, we reject the Millers' argument that a decision could adequately be made pre-birth that denying all post-birth resuscitative treatment would be in Sidney's best interest. Such a decision could not control whether the circumstances facing Dr. Otero were emergent because it would not have been a fully informed one according to the evidence in this case.

The Millers point out that physicians routinely ask parents to make pre-birth treatment choices for their infants including whether to accept or refuse in utero medical treatment and to continue or terminate a pregnancy. While that may be entirely true, the evidence here established that the time for evaluating Sidney was when she was born. The evidence further reflected that Sidney was born alive but in distress. At that time, Dr. Otero had to make a split-second decision on whether to provide life-sustaining treatment. While the Millers were both present in the delivery room, there was simply no time to obtain their consent to treatment or to institute legal proceedings to challenge their withholding of consent, had the Millers done so, without jeopardizing Sidney's life. Thus, although HCA never requested a jury instruction, nor challenged the absence of a jury instruction, on whether Dr. Otero treated Sidney under emergent circumstances, the evidence conclusively established that Dr. Otero was faced with emergent circumstances when he treated Sidney. Those circumstances resulted from not being able to evaluate Sidney until she was born, not because of any delay or inaction by HCA, the Hospital, or Dr. Otero. As HCA's expert testified:

I think the important thing to realize here is the physicians have an obligation both for assessment and treatment, and the physicians fulfilled that obligation in this case by attending the delivery, making immediate assessment and determining that the child was viable. That's an important diagnosis that the physicians—two physicians felt that Sidney had the ability to live outside the womb. Having done so, it is important that life-sustaining treatment be given on an emergent basis where that is essential to the maintenance of life, and that is what was done here. It would be improper not to order that care in [an] emergent ... situation.

40. 36 S.W.3d at 198.

We acknowledge that certain physicians in this case initially asked the Millers to decide whether Sidney should be resuscitated some eleven hours before her birth. And certain physicians and Hospital administrators asked the Millers to consent to the subsequent plan developed to have a neonatologist present at Sidney's delivery to evaluate and possibly treat her. We agree that, whenever possible, obtaining consent in writing to evaluate a premature infant at birth and to render any warranted medical treatment is the best course of action. And physicians and hospitals should always strive to do so. But if such consent is not forthcoming, or is affirmatively denied, we decline to impose liability on a physician solely for providing life-sustaining treatment under emergent circumstances to a new-born infant without that consent.

The Millers contend that they offered testimony from Dr. Otero that Sidney might have survived without treatment. But we do not read Dr. Otero's testimony as saying that. At one point, Dr. Otero testified that there was no doubt that Sidney would have died but for his treatment of her. He then testified that premature infants, like Sidney, might not die immediately without treatment but are still alive within two or three hours gasping for breath or crying and then are rushed to him for treatment. Therefore, contrary to the Miller's assertion, Dr. Otero did not testify that Sidney might well have survived without any treatment at all. .

Moreover, there was testimony that the sooner treatment was provided, the better chance Sidney had for survival without brain damage or, at least, without further brain damage. Thus, the evidence established that, at Sidney's birth, Dr. Otero was faced with emergent circumstances in deciding whether to treat Sidney in an attempt to prevent her otherwise likely death.

There was testimony that Dr. Otero's resuscitative treatment caused Sidney's mental and physical infirmities. But there was also testimony that it did not and, in fact, the oxygen provided during the first days of Sidney's life prevented her from suffering even further brain damage. Although the jury found that the HCA's and the Hospital's negligence caused the "occurrence in question," it is unclear what was meant by the "occurrence in question."

If that phrase refers to Sidney's mental and physical infirmities, the Millers never sued Dr. Otero or any other physician. And there was no allegation that they negligently treated Sidney, which caused her infirmities. Instead, the Millers' only negligence claim was that HCA and the Hospital had policies, or lacked policies, and took actions that allowed Sidney to be treated without their consent. Thus, their negligence claim is based on the lack of consent before treatment, just like their battery claim.

If the phrase refers to Dr. Otero resuscitating Sidney against the Millers' wishes, it was not HCA's or the Hospital's policies, or lack thereof, that permitted Dr. Otero to treat Sidney without consent. Rather, it was the emergent circumstances that caused that to happen. Because Dr. Otero treated Sidney under emergent circumstances, he did not commit a battery. And because Dr. Otero did not commit a battery, HCA is not liable derivatively.[41] Nor was the Hospital negligent for allow-

---

41. *See Lone Star Partners v. NationsBank Corp.*, 893 S.W.2d 593, 598–99 (Tex.App.-Tex- arkana 1994, writ denied).

ing Dr. Otero to treat Sidney under the circumstances without the Millers' consent.

The Millers raise additional arguments that we need not address, given our holding on the emergent circumstances exception. Similarly, HCA raises several arguments about why it cannot be held liable for the Millers' battery and negligence claims. Although we do not need to address those arguments to resolve this case, we do address two matters that the court of appeals discussed.

■ HCA argues that the federal "Baby Doe" regulations [42] are part of Texas law and forbid any denial of medical care based on quality-of-life considerations. While we do not disagree with HCA's assertion as a general proposition, HCA cites 42 U.S.C. § 5106a(b)(2)(B) as support for its contention that the Baby Doe regulations were "scrupulously followed in this case" and "faithful adherence to the public policy established by the regulations should not be thwarted through civil liability in damages...." But 42 U.S.C. § 5106a(b)(2)(B) provides that a federally-funded state must implement "procedures for responding to the reporting of medical neglect" which include:

> authority, under State law, for the State child protective services system to pursue any legal remedies, including the authority to initiate legal proceedings in a court of competent jurisdiction, as may be necessary to prevent the withholding of medically indicated treatment from disabled infants with life-threatening conditions.[43]

Assuming that this provision applies here, it states that Texas must provide a mecha-

nism by which the child protective services system can initiate legal proceedings to prevent the withholding of medical treatment from infants. And the Family Code and Texas Administrative Code contain such provisions.[44]

But it is undisputed that neither the Hospital nor HCA initiated or requested child protective services to initiate legal proceedings to override the Millers' "withholding of medical treatment" by refusing to consent to Sidney's treatment. Thus, the federal funding regulations appear to contemplate legal proceedings to override the lack of parental consent, and they do not answer the question of whether Dr. Otero committed a battery by providing treatment without doing so. Further, we agree with the court of appeals' conclusion that the disposition of that issue "is governed by state law rather than federal funding authorities."[45]

HCA also argues, and the court of appeals agreed, that parents can withhold "urgently-needed life-sustaining medical treatment" for their child only when the requirements of the Natural Death Act are satisfied—*i.e.*, only when the child is certifiably terminal. But the Act expressly states that it does not impair or supersede any legal right a person may have to withhold or withdraw life-sustaining treatment in a lawful manner.[46] In any event, we need not decide this issue. The Millers asserted battery and negligence claims based on Dr. Otero treating Sidney without their consent. As we have discussed, when emergent circumstances exist, a physician cannot be held liable under either battery or negligence theories solely for

---

**42.** 42 U.S.C. §§ 5101 *et seq.;* 45 C.F.R. §§ 1340.1 *et seq.*

**43.** 42 U.S.C. § 5106a(b)(2)(B) (footnote omitted).

**44.** *See, e.g.,* Tex. Fam.Code §§ 261.101, 261.103; 40 Tex. Admin. Code § 700.504.

**45.** 36 S.W.3d at 196–97.

**46.** Tex. Health & Safety Code § 166.051.

providing life-sustaining medical treatment to a minor child without parental consent.

### III. Conclusion

Dr. Otero provided life-sustaining treatment to Sidney under emergent circumstances as a matter of law. Those circumstances provide an exception to the general rule imposing liability on a physician for providing treatment to a minor child without first obtaining parental consent. Therefore, Dr. Otero did not commit a battery. And HCA cannot be held liable for the Millers' battery and negligence claims. We are not presented with and do not decide the question of whether the rule we have announced applies to adults. We affirm the court of appeals' judgment.

Justice O'NEILL and Justice SMITH did not participate in the decision.