HAYNES, Circuit Judge,
concurring and dissenting:
I concur in the majority opinion’s disposition of this appeal with the exception of Section VII, addressing the claim under the Fourteenth Amendment, as to which I respectfully dissent.
Initially, on procedural grounds, I disagree with reaching the Fourteenth *596 Amendment issue at all on this appeal. Although the doctors asserted qualified immunity in a general sense to Sama’s lawsuit below in their motion for summary-judgment, they, as well as the district court, failed to address Sama’s Fourteenth Amendment issue, focusing instead on Sama’s Eighth Amendment issue.[1] Thus, rather than addressing Sama’s Fourteenth Amendment issue for the first time on appeal, we should remand to allow the district court to examine it in the first instance. Although I recognize that once a defendant asserts a qualified immunity defense the burden shifts to the plaintiff to rebut it, Kovacic v. Villarreal, 628 F.3d 209, 211-12 (5th Cir.2010), cert. denied, - U.S. -, 131 S.Ct. 2995, 180 L.Ed.2d 821 (2011), I disagree procedurally that a plaintiff (particularly, a pro se prisoner) is required to imagine every possible argument a defendant could make— especially, such an unfathomable argument as that doctors can act at will and contrary to a patient’s consent — and counter it.
As the majority opinion acknowledges, under the substantive due process clause of the Fourteenth Amendment, a competent person has a liberty interest in refusing unwanted medical treatment. See Cruzan v. Dir., Mo. Dep’t of Health, 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (finding that “a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment”); Washington v. Harper, 494 U.S. 210, 221-22, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); Thompson v. Upshur Cnty., Tex., 245 F.3d 447, 462 n. 10 (5th Cir.2001) (“There is no question that a competent person has a liberty interest in refusing unwanted medical treatment.”) (internal quotation marks, ellipsis, and citation omitted). Sama’s complaint alleged that she refused to consent to the removal of her ovary under any circumstances and complained of several alleged constitutional violations, including violations of the Fifth, Eighth, and Fourteenth Amendments. She further alleged that “[t]he wrongful removal of her ovary without her consent and in violation of the agreed upon treatment plan [constituted a] violation of her civil and constitutional rights! ] to refuse non-court ordered treatments.” In her response to the doctors’ summary judgment motion, Sama cited Cruzan and argued that she had a constitutional liberty interest in refusing unwanted medical treatment as well as the right to die if she so desired. Indeed, contrary to the majority opinion’s assertion at pages 15-16, Sama fervently argued in her response that she was willing to “risk death by the leaving of an ovary that might have to be later removed due to malignancy, in order to have her own child,” and further argued in her surreply that she “had a right to refuse those parts of the treatment, even if it meant choosing the right to die.”
Neither the motion for summary judgment nor the district court’s order granting that motion addressed Sama’s claim that the doctors disregarded her lack of consent to the removal of her ovary and thereby violated her Fourteenth Amendment due process rights. Indeed, the doctors have never argued that they could remove her ovary without consent. To the contrary, instead of arguing that they did *597 not need Sama’s consent, the doctors consistently argued in the district court (and here[2]) that “they had a good faith belief that Sama understood the probability of ovary removal and consented to the doctors’ intra-operative judgment.” In other words, the doctors’ position has always been that they, in fact, had Sama’s consent to the removal of her one remaining ovary. As a result, nothing in the summary judgment motion would have put Sama on notice that she must imagine an argument not made and rebut it.
The district court did not address the Fourteenth Amendment claim at all, analyzing Sama’s claims only under the Eighth Amendment deliberate indifference standard. Accordingly, I conclude on procedural grounds that we should remand the case to the district court with regard to Sama’s Fourteenth Amendment claim.[3]
The majority opinion concludes that “[bjecause Sama did not meet her burden of demonstrating Benoit’s and Hannigan’s conduct was not objectively reasonable in light of clearly established law, the district court did not err in dismissing the case.” Maj. Op. at 592. Furthermore, although the majority opinion acknowledges a clear constitutional right for a prisoner to refuse medical treatment, it finds that the doctors are entitled to qualified immunity for the unauthorized removal of Sama’s ovary because Sama had arguably authorized[4] “radical” hysterectomy and because the doctors’ intra-operative observation of the ovary suggested that the ovary was nonfunctional. Maj. Op. at 592-94. Furthermore, the majority opinion contends that *598 the doctors would not have been on notice that they were violating clearly established law because there is not another case like this one. Maj. Op. at 594.
That there be another case exactly like this one is not required to deny qualified immunity. See Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (“We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.”); Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Moreover, although we should certainly be relieved that there is not another case exactly like this one, even the very precedents cited in the majority opinion clearly establish that a prisoner-patient has the right to refuse treatment. Maj. Op. at 591 n.13. Given that body of law, it is difficult to see how it is “objectively reasonable” to think that one is not violating the rights of a patient as adamant as Sama claims she was about what she did and did not authorize.
Indeed, even the doctors themselves have not made the argument utilized by the majority opinion." The doctors, perhaps in consideration of their own medical ethics[5] and professional reputations, never said they could countermand their patient’s expressed wishes and remove the ovary over her objection. See Murphy v. Russell, 167 S.W.3d 835, 838 (Tex.2005) (“Medical treatment will not constitute a battery unless it is provided without the patient’s consent.”); Miller v. HCA, Inc., 118 S.W.3d 758, 767 (Tex.2003) (“[T]he general rule in Texas is that a physician who provides treatment without consent commits a battery.”). No doubt, the doctors are well aware that “all fallopian tube and ovarian surgery with or without hysterectomy, including removal and lysis of adhesions,” is a List A procedure as dictated by the Texas Medical Disclosure Panel and thus, disclosure and consent to ovarian surgery are specifically required by Texas statute. Tex. Civ. Prac. & Rem.Code Ann. § 74.101, et seq. (West 2011); 25 Tex. Admin. Code §§ 601.1, 601.2(g)(3) (2011).
The doctors thus have not, could not, and indeed, dared not, argue that a doctor providing treatment to a prisoner-patient is free to roam about the prisoner-patient’s body during surgery, exercising his “medical judgment” against the expressed wishes of the prisoner-patient. Instead, they argued that she consented (or that they had a good faith belief that she did), a point as to which the majority opinion concedes (or at least accepts for argument’s sake) there is a fact issue. With that said, it is bewildering that such bedrock principles of medical ethics and legal-medico jurisprudence that there be consent to treatment and respect for a patient’s right to choose his course of treat *599 ment are effectively deemed not clearly established law by operation of the majority opinion. See Tex. Med. Providers Performing Abortion Servs. v. Lakey, No. 11-50814, 2012 WL 45413, at *13 (5th Cir.Jan. 10, 2012) (Higginbotham, J., concurring) (“The doctor-patient relationship has long been conducted within the constraints of informed consent to the risks of medical procedures, as demanded by the common law, legislation, and professional norms. The doctrine itself rests on settled principles of personal autonomy, protected by a reticulated pattern of tort law, overlaid by both self- and state-imposed regulation.”); Wall v. Brim, 138 F.2d 478, 481 (5th Cir.1943) (“The law is well settled that an operation cannot be performed without the patient’s consent and that one performed without consent, express or implied, is a technical battery or trespass for which the operator is liable.... The same principle ... also supports the holding that a surgeon may not perform an operation different in kind from that consented to or one involving risks and results not contemplated.” (footnotes omitted)).[6]
A pro se plaintiffs pleadings are to be construed liberally with all well-pleaded allegations taken as true. Perez v. United States, 312 F.3d 191, 194-95 (5th Cir.2002) (citing Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding that allegations in a pro se complaint are to be held “to less stringent standards than formal pleadings drafted by lawyers”)); Johnson v. Atkins, 999 F.2d 99, 100 (5th Cir.1993) (citing Brinkmann v. Johnston, 793 F.2d 111, 112 (5th Cir.1986)). In addition, on summary judgment, “all evidence produced by the nonmovant is taken as true and all inferences are drawn in the nonmovant’s favor.” Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 349 (5th Cir.2001).
Applying those standards, Sama’s evidence, as the majority opinion notes, is that she vociferously and clearly stated that she did not want her ovary removed because she fiercely desired at least the chance to have a biological child born through a surrogate.[7] She averred that she stated this at every turn to every medical professional along the chain of professionals she encountered — “[w]ith each and every one of the team of [doctors,] I made it clear that I would not sign any permits that allowed the removal of my ovary.” Indeed, she purposely refused to initial the section of the disclosure forms that would permit removal of the ovary even if deemed medically necessary — “I was given no fewer than three lymph node and ovary removal permits and I would not sign them because I would not consent to the removal of my ovary under any circumstances.” Thus, she had taken every step she could possibly take to make *600 her lack of consent to ovary removal known. She then trusted in the doctors to follow her wishes while she was unconscious and unable to physically stop them.
Here, it is undisputed that the doctors did just the opposite of Sama’s wishes and removed Sama’s ovary and, thereby, extinguished her last hope of conceiving her own biological child.[8] In spite of that, the majority opinion focuses on Sama’s arguable consent to a “radical” hysterectomy. Yet even the majority opinion’s own discussion shows that a “radical” hysterectomy does not necessarily entail removal of the ovary. The majority opinion also posits that Sama’s nonconsent was only limited by her purpose for ovarian conservation so that when the doctors concluded in their medical judgment that Sama’s ovary was nonfunctional and possibly (ultimately, but certainly not immediately) life-threatening, they did not violate her nonconsent by removing it. Maj. Op. at 593-94. This argument was never made by the doctors.
The majority opinion’s argument presupposes that Sama would have consented to the removal of her ovary if she had known that it was “nonfunctional” or (ultimately) “life-threatening.” These ruminations turn the summary judgment review standard on its head. Rather than taking Sama’s evidence as true, the majority opinion creates an implied consent by directly contravening Sama’s position and evidence and ignoring Sama’s claim that she refused consent “no matter what” and that she was willing to risk needing future surgical procedures and even death to conserve her one remaining ovary. Moreover, a highly disturbing aspect of this case is that despite the doctors’ exercise of “considered medical judgment” and their self-serving assessments that it was “unlikely that any egg harvesting could ever be performed,” even the doctors themselves admitted that they could not “state conclusively that Ms. Sama’s ovary did not remain active, with the ability to produce eggs.” Furthermore, the pathology report on the ovary whose continued presence in Sama’s body was allegedly life-threatening in the doctors’ judgment, revealed that the ovary was not cancerous.[9]
In addition, the core of the issue at bar is the liberty interest in refusing unwanted medical treatment, even life-saving medical treatment. Accordingly, the ultimate purpose for Sama’s desire for ovary conservation is irrelevant if we take as true that Sama refused consent to ovary removal “under any circumstances.” The majority opinion’s emphasis on the viability of the ovary or the eventual threat that it may have posed to Sama’s life as bringing the removal of Sama’s ovary “within her grant of consent” cannot be squared with the prisoner-patient’s liberty interest in refusing unwanted medical treatment.
Given Sama’s clear instructions not to remove the ovary, we do not have a murky situation of a doctor having consent to perform a specific surgery but then some emergency arises necessitating some other form of surgery. See Dunham v. Wright, *601 423 F.2d 940, 941-42 (3d Cir.1970) (calling it a “blackletter rule, clear and simple on its face,” that “[ljegal-medico jurisprudence requires that a physician obtain the consent of a patient before performing surgery unless the need for such consent is obviated by an emergency which places the patient in immediate danger and makes it impractical to secure such consent”). Nor do we have any other “gray area” where the “not clearly established” jurisprudence arises. We have clear law that says a prisoner-patient has a constitutional right to say “no,” we have a patient who said “no,” and we have doctors who are not claiming that the law would have permitted their conduct despite this “no.”
The effect of the majority opinion’s conclusion today is that, once a patient consents to at least some treatment, all treatment is permissible so long as the doctor deems it necessary. What, then, is left of the right to refuse treatment? At the very least, Sama should be permitted to develop this issue in the district court. Furthermore, at this juncture, whether Sama is entitled to remand on her Fourteenth Amendment claim should not be diminished or influenced by her chances of obtaining damages at trial.
For the foregoing reasons, I respectfully dissent to Section VII of the majority opinion.

. Indeed, the doctors only discussed the standards for an Eighth Amendment claim regarding denial of medical treatment in their motion for summary judgment and similarly, only addressed her Eighth Amendment claim in their reply to Sama’s response to their motion for summary judgment. Quite notably, even Sama herself, in her surreply, pointed out that the doctors had only addressed her Eighth Amendment claim and not her Fifth and Fourteenth Amendment claims, and yet, the district court, like the doctors, only addressed her Eighth Amendment claim in its memorandum and order of dismissal.

. Their argument on this point, after acknowledging Cruzan, was the following: "[Tjhere have been no cases where this Court or the Supreme Court have found that a doctor has violated a patient’s right to refuse medical treatment where the evidence overwhelmingly shows that the doctor performed the allegedly unwanted procedure with the good faith belief that the patient consented to it, and when it was undisputedly in the patient’s best interest.”

. On remand, the district court could address any necessary balancing between the prisoner's liberty interests and any state interests in providing appropriate medical treatment. Certainly it cannot be said on this record as a matter of law that the state’s interest in providing treatment for a non-emergency condition outweighs Sama's interest in preserving whatever possibility she may have of conceiving a biological child. This is not to say that had there been a claimed emergency or necessity, the outcome would be different. Indeed, as discussed in Cruzan, a competent person has the right to refuse even lifesaving medical treatment. 497 U.S. at 278-87, 110 S.Ct. 2841.
. Furthermore, the majority opinion states that the assertion in Dr. Benoit’s affidavit that "it was determined that the ovary had to be removed in order to reach and remove anatomic structures necessary to the performance of the radical portion of the hysterectomy” is uncontroverted. Maj. Op. at 593. However, review of the record shows that there was no medical emergency or necessity requiring removal of the ovary. Indeed, even the affidavit of Dr. Hannigan, Dr. Benoit's attending faculty surgeon, calls into question the claim that the ovary absolutely had to be removed for any reason: "[i]t was our opinion that there was no grossly viable — normal ovarian tissue, that the ovary was non-functional, and, therefore, the ovary was removed .... It was our reasoned medical judgment that the best long-term outcome for the patient would be removal of the ovary at the time of this procedure. It was in the patient's best interest to remove the ovary.” Moreover, Dr. Hannigan, despite the incentive to state otherwise, never asserts that removal of the ovary was necessary to complete the radical portion of the hysterectomy. Thus, not only was removal of the ovary not the result of some life-threatening emergency or imminent situation, but also the suggested necessity of removal is indeed in doubt.

. Sama contends that the handwritten language “radical hysterectomy and any other indicated procedure, lymph node dissection” was not there when she signed the consent form.

. The characteristic that distinguishes a profession, such as medicine, from a trade, such as repairing automobiles, is that the members establish and maintain standards of training, competence, and professional behavior. These standards are enforced by professional organizations, such as the American Medical Association, which has a Council on Ethical and Judicial Affairs.
Traditionally, medical ethics covers a wide range of behavior, including the physician’s involvement with patients and their families, and his or her competence, public image, and commercial behavior.
Physicians must not abuse the relationship of trust they develop with patients.... They must give clear priority to their patients’ interests.
The physician should ensure that the patient not only consents to all procedures, investigations, and treatments, but that this consent is based on an unbiased and full explanation of any risks, drawbacks, and alternatives that might be considered.
The American Medical Association, Encyclopedia of Medicine 422 (Charles B. dayman, MD ed., 1989).

. I certainly recognize that § 1983 is not a means to federalize state tort law, and I do not suggest that the doctors can or should be held liable here merely for violations of Texas law. I cite to these cases, statutes, and standards because they inform the analysis of what clearly established law shows the right to refuse consent means and whether it could be objectively reasonable for the doctors to think they could act contrary to the prisoner-patient’s refusal under the facts as Sama alleges them to be.

. It is uncertain whether Sama has previously had children. Her memorandum of law in support of her first amended complaint states that she never had any children and that prior to her incarceration, Sama and her husband had looked into the possibility of harvesting her ova for implantation in a surrogate because of her fertility problems. However, a note in her medical records states that Sama reported having children via surrogacy before. Regardless, one fact that is resoundingly clear, even in that same medical records note, is that Sama desired to keep her remaining ovary.

. Although it has been the focus of much of the majority opinion, removal of Sama’s one remaining ovary was not simply the end to her ability to have biological children. Instead, diere are also immediate physical consequences that may seriously impact Sama— for example, the (sometimes severe) hormonal changes caused by ovary removal. An ovary is not an appendix.

. I do not here quarrel with the idea that medical negligence is insufficient for § 1983 liability. Instead, I seek to counter the majority opinion's assumption that the right to refuse consent can be vitiated by the doctor’s own (apparently incorrect) "medical judgment” against the will of his patient or that it would be reasonable for a doctor to think so.